Filed 6/9/22

**CERTIFIED FOR PUBLICATION**

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| In re JESSIE SAMBRANO<br><br>on Habeas Corpus. | E078147<br><br>(Super.Ct.No. INF051722<br><br>OPINION |

ORIGINAL PROCEEDINGS; petition for writ of habeas corpus. James S. Hawkins, Judge. Petition granted.

The Law Offices of Aaron J. Schechter and Aaron J. Schechter for Petitioner.

Rob Bonta, Attorney General, Lance W. Winters, Chief Assistant Attorney General, Daniel Rogers, Lise S. Jacobson, and Christopher P. Beesley, Deputy Attorneys General, for Respondent.

In this habeas corpus proceeding, Jesse Espinoza Sambrano seeks reversal of his attempted murder convictions because his jury was given a kill zone instruction that is erroneous under *People v. Canizales* (2019) 7 Cal.5th 591 (*Canizales*). The People concede the error but argue that it was harmless beyond a reasonable doubt. We disagree and grant the petition.

We publish this opinion in order to reiterate the following principles concerning the kill zone theory:

If there is no evidence of a primary target, then the kill zone theory does not apply. (*Canizales*, *supra*, 7 Cal.5th at p. 608 ["evidence of a primary target is required"].)

Relatedly, if the evidence shows only that the defendant intended to kill everyone in a particular area, but not *as a means of ensuring the death of a primary target*, then the kill zone theory does not apply. (*Canizales*, *supra*, 7 Cal.5th at p. 607 [a kill zone is "an area in which the defendant intended to kill everyone present to ensure the primary target's death"].)

If there is evidence of a primary target, but the evidence shows only that the defendant subjected people near the primary target to lethal risk, or that the defendant acted with conscious disregard of the risk of serious injury or death for people near the primary target, then the kill zone theory does not apply. (*Canizales*, *supra*, 7 Cal.5th at p. 607.)

Jury instructions on the kill zone theory are *never* required. (*People v. Stone* (2009) 46 Cal.4th 131, 137-138 (*Stone*); *People v. Smith* (2005) 37 Cal.4th 733, 746 (*Smith*); *People v. Bland* (2002) 28 Cal.4th 313, 331, fn. 6 (*Bland*).)

## BACKGROUND

The following facts are taken from this court's unpublished opinion on Sambrano's direct appeal, *People v. Sambrano* (Nov. 15, 2013, E054725) [nonpub. opn.], and the record in that appeal. (See *In re Taylor* (2019) 34 Cal.App.5th 543, 556-557.)

2

We describe only those facts relevant to the attempted murder convictions and the kill zone theory.

Sambrano and his two codefendants, Anthony Lares and Daniel Torres, are all alleged members or associates of a gang called Varrio Coachella Rifa 52 (Varrio Coachella). On the night in question, they drove into the territory of a rival gang, North Side Indio (North Side). Sambrano drove the car, Torres was the front passenger, and Lares was in the back seat. After repeatedly driving past a group of people gathered outside a house, Sambrano stopped the car, and Lares and Torres began shooting. Lares admitted firing at least 10 rounds from his .30–caliber M1 carbine rifle. Torres fired an unknown number of shots from a .22–caliber handgun that held five rounds. The shots killed one person and seriously wounded two others, all of whom were outside the house at the time of the shooting.

At trial, the parties disagreed about the motivation for the shooting. The prosecutor's theory was that the shooting was gang related, specifically that Sambrano, Lares, and Torres were retaliating for a rival gang's graffiti in Varrio Coachella territory, near the home of Sambrano's godmother. The prosecutor presented both photos depicting the allegedly offending graffiti and expert testimony regarding the general significance of gang graffiti and the particular significance of a gang's leaving its graffiti in the territory of a rival. In this case, North Side not only left graffiti in Varrio Coachella territory but also obliterated Varrio Coachella's own gang graffiti, which the expert opined would be viewed by Varrio Coachella members as disrespectful.

3

According to the expert, when a gang member believes they have been disrespected, they must retaliate with violence. Otherwise, the status of both the gang and the member would be diminished.

Both Sambrano and Lares eventually admitted that they were involved in the shooting. Lares claimed that they had been looking for a girl he knew, who lived somewhere in the neighborhood. While looking for her, they passed by the gathering in front of the house. When they drove by a second time, Torres fired at the group. But Lares was hallucinating as a result of various substances he had ingested, and he thought shots had been fired at them from the group outside the house. That is why he fired back with the M1 rifle, which he kept in the trunk of the car for protection.

Sambrano told law enforcement officers that on the evening of the shooting he was driving his companions around to try to find a girl he knew, concerning a matter unrelated to the graffiti, and he did not know that his companions had guns. Sambrano claimed that he drove past the house at least once, turned the car around, and drove back to see if the girl they were looking for was among the people outside the house. He was just pulling up to the curb in front of the house and about to park the car when he heard seven or eight gunshots, after which Lares opened fire from the back seat. Sambrano then immediately pulled away from the curb and drove off.

The Rodriguez family lived in the house where the shooting occurred. Jacob Rodriguez and his girlfriend had just walked out the front door when the gunfire started. Jacob's girlfriend was hit by three bullets and died. Jacob and another attendee who was

standing outside were hit by bullets too, but they survived. The four remaining attempted murder counts involved four people who were inside the house when the shooting occurred. Three of them were children. None was hit by a bullet.

DISCUSSION

A. *Timeliness*

The People argue that Sambrano's habeas petition is procedurally barred as untimely. We are not persuaded.

"Whether a claim has been timely presented is assessed based on an indeterminate reasonableness standard." (*Robinson v. Lewis* (2020) 9 Cal.5th 883, 890 (*Robinson*).) We assume for purposes of our analysis that as of the Supreme Court's issuance of *Canizales* in June 2019 (*Canizales*, *supra*, 7 Cal.5th at p. 591), Sambrano ""'"knew, or reasonably should have known, of the information offered in support of the claim and the legal basis for the claim"'"" (*In re Reno* (2012) 55 Cal.4th 428, 460, superseded by statute on another ground as stated in *In re Friend* (2021) 11 Cal.5th 720, 727-729). Sambrano is not a lawyer, and he was not represented by a lawyer between 2013 and 2021. In 2021, a lawyer was appointed to represent Sambrano on appeal from the denial of a resentencing petition under Penal Code section 1170.95. This habeas petition was filed by Sambrano's attorney about two months later.

We conclude that given these circumstances the habeas petition was timely filed under the applicable "indeterminate reasonableness standard." (*Robinson*, *supra*, 9 Cal.5th at p. 890; see also *In re Saunders* (1970) 2 Cal.3d 1033, 1040 [delay of nearly

5

five years was justified given that the petitioner "had only a ninth grade education and was without experience or education in law"].)

B. Canizales *and the Kill Zone Theory*

"The elements of attempted murder are 'specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing.' [Citation.] 'When a single act is charged as an attempt on the lives of two or more persons, the intent to kill element must be examined independently as to each alleged attempted murder victim; an intent to kill cannot be "transferred" from one attempted murder victim to another under the transferred intent doctrine.' [Citation.] But consistent with those requirements, the kill zone theory, which was first approved by the Supreme Court in [*Bland*, *supra*, 28 Cal.4th at pp. 327, 330], 'yields a way in which a defendant can be guilty of the attempted murder of victims who were not the defendant's "primary target."'" (*People v. Cardenas* (2020) 53 Cal.App.5th 102, 111 (*Cardenas*).)

In *Canizales*, the Supreme Court reexamined the kill zone theory and clarified its scope. (*Canizales*, *supra*, 7 Cal.5th at p. 606; *Cardenas*, *supra*, 53 Cal.App.5th at p. 112.) *Canizales* held "that the kill zone theory for establishing the specific intent to kill required for conviction of attempted murder may properly be applied only when a jury concludes: (1) the circumstances of the defendant's attack on a primary target, including the type and extent of force the defendant used, are such that the only reasonable inference is that the defendant intended to create a zone of fatal harm—that is, an area in which the defendant intended to kill everyone present to ensure the primary

6

target's death—around the primary target and (2) the alleged attempted murder victim who was not the primary target was located within that zone of harm. Taken together, such evidence will support a finding that the defendant harbored the requisite specific intent to kill both the primary target and everyone within the zone of fatal harm." (*Canizales*, at p. 607.)

The Supreme Court further explained that "the kill zone theory does not apply where 'the defendant merely subjected persons near the primary target to lethal risk.'" (*Canizales*, *supra*, 7 Cal.5th at p. 607.) The Supreme Court emphasized that "'in a kill zone case, the defendant has a primary target and reasons [that] he cannot miss that intended target if he kills everyone in the area in which the target is located. In the absence of such evidence, the kill zone instruction should not be given.'" (*Ibid.*, quoting *People v. Medina* (2019) 33 Cal.App.5th 146, 156 (*Medina*).) The court also rejected the Attorney General's argument "that for the kill zone theory to apply it is not necessary that the defendant have a primary target." (*Canizales*, at p. 608.) The court concluded to the contrary that in order for the kill zone theory to apply, "evidence of a primary target is required." (*Ibid.*)

C. *Retroactivity of* Canizales

In general, we will not issue a writ of habeas corpus for "an issue which was raised and rejected on direct appeal, or which could have been, but was not, raised on direct appeal." (*In re Saldana* (1997) 57 Cal.App.4th 620, 627.) "An exception to the rule applies '"when there has been a change in the law affecting the petitioner."'" (*In re*

7

*Rayford* (2020) 50 Cal.App.5th 754, 770 (*Rayford*); *In re Terry* (1971) 4 Cal.3d 911, 916 [new United States Supreme Court decision justifies habeas corpus petition on issue not previously raised]; *In re Harris* (1993) 5 Cal.4th 813, 841, disapproved on another ground in *Shalabi v. City of Fontana* (2021) 11 Cal.5th 842, 854, fn. 5.) "'To trigger this exception, the change in the law must have retroactive effect.'" (*Rayford*, *supra*, at p. 770.)

The Supreme Court did not state whether *Canizales* applies retroactively to final judgments. (*Canizales*, *supra*, 7 Cal.5th at pp. 602-618.) Relying on *Rayford*, *supra*, 50 Cal.App.5th 754, Sambrano argues that *Canizales* applies retroactively to cases like his that were final when the decision issued, because it substantively changed the law on the kill zone theory. The People agree, and so do we.

Applying both federal and state law retroactivity standards, *Rayford* held that *Canizales*, *supra*, 7 Cal.5th 591, applies retroactively to cases in which the judgment is already final. (*Rayford*, *supra*, 50 Cal.App.5th at pp. 770-778.) *Rayford* concluded that *Canizales* affected a substantive change in the law. (*Rayford*, at pp. 776-778.) *Rayford* further explained that *Canizales* "altered the range of conduct for which a defendant may be tried and convicted of attempted premeditated murder by holding trial courts should only instruct the jury on the kill zone theory of concurrent intent where 'there is sufficient evidence to support a jury determination that the *only* reasonable inference from the circumstances of the offense is that a defendant intended to kill everyone in the zone of fatal harm.'" (*Rayford*, at p. 777.)

8

We agree with *Rayford*'s analysis and conclusion. *Canizales* applies retroactively to Sambrano's case even though the judgment was final when *Canizales* was decided.

D. *The Kill Zone Jury Instruction Was Erroneous*

On the attempted murder counts, the trial court instructed the jury with former CALCRIM No. 600, stating that Sambrano could be found guilty of attempted murder if he created a kill zone and intended to kill everyone within that zone.[1] The jury also was instructed that it could find Sambrano guilty of attempted murder if he intended to kill each of the six victims specifically. In closing argument, the prosecutor relied almost exclusively on the kill zone theory in arguing that Sambrano possessed the necessary mental state for the attempted murder counts.

In *Canizales*, the jury was instructed with the same version of CALCRIM No. 600 given here. (*Canizales*, *supra*, 7 Cal.5th at p. 601 & fn. 3.) *Canizales* concluded that the instruction did not accurately describe the kill zone theory. (*Id.* at pp. 609, 613.) *Canizales* explained that the instruction was flawed because it did not adequately define the term "kill zone" and failed to direct the jury to consider the circumstances of the attack in determining whether the defendant's attempt to kill everyone around the

---

[1] The jury was instructed that the prosecution had to prove two elements to prove attempted murder: "1. The defendant took at least one direct but ineffective step toward killing another person; [¶] AND [¶] 2. The defendant intended to kill that person." The jury was instructed as follows concerning the kill zone theory: "A person may intend to kill a specific victim or victims and at the same time intend to kill everyone in a particular zone of harm or 'kill zone.' A person need not be aware of other victims in the 'kill zone.' In order to convict the defendant of the attempted murder of [the six alleged victims], the People must prove that the defendant not only intended to kill a person at the gathering but also either intended to kill [the six alleged victims] or intended to kill everyone within the kill zone."

9

primary target was undertaken as a mean of killing the primary target. (*Ibid.*) The Supreme Court recommended that the instruction be revised. (*Id.* at p. 609.)

Sambrano argues that the trial court erred by giving the same flawed version of CALCRIM No. 600 given in *Canizales*, and the People concede the point. We agree with the parties. It was error to instruct the jury with the former version of CALCRIM No. 600. In addition to the flaws in the instruction identified by the Supreme Court in *Canizales*, the instruction did not require the jury to find that Sambrano specifically intended to kill everyone in the area around the primary target *as a means of killing that primary target*, which is required for application of the kill zone theory. (*Canizales*, *supra*, 7 Cal.5th at p. 607.) Indeed, the instruction did not define a kill zone in terms of a primary target at all—it did not even state that a kill zone is an area in which the primary target is located.

We note that CALCRIM No. 600 was heavily revised in light of *Canizales*, and it is now considerably longer and more complex than the version given at Sambrano's trial. But even the current, revised version of the instruction largely retains one of the defects we have identified. In articulating the elements of the kill zone theory, the revised instruction does not require the jury to find that the defendant intended to kill everyone in the area around the primary target *in order to ensure the death of the primary target*. Instead, the revised version provides: "A person may intend to kill a primary target and also [a] secondary target[s] within a zone of fatal harm or 'kill zone.' A 'kill zone' is *an area in which the defendant used lethal force that was designed and intended to kill*

10

*everyone in the area around the primary target*." (CALCRIM No. 600, italics added.) Again, *Canizales* clarified that unless the defendant intended to kill everyone in the area around the primary target *in order to effectuate the killing of the primary target*, the kill zone theory does not apply. (*Canizales*, *supra*, 7 Cal.5th at p. 607 [a kill zone is "an area in which the defendant intended to kill everyone present to ensure the primary target's death"]; *ibid.* ["'[I]n a kill zone case, the defendant has a primary target and reasons [that] he cannot miss that intended target if he kills everyone in the area in which the target is located. In the absence of such evidence, the kill zone instruction should not be given'"].) The revised instruction's only allusion to that requirement appears in the last sentence of the instruction, which tells the jury, "If you have a reasonable doubt whether the defendant . . . intended to kill [the primary target] by killing everyone in the kill zone, then you must find the defendant not guilty of the attempted murder of [the other people in the zone]." (CALCRIM No. 600.) But jurors might well be confused when they discover in the final sentence that a reasonable doubt about whether the defendant intended to kill the primary target *by killing everyone in the kill zone* requires them to find the defendant not guilty, given that nowhere else does the instruction say an intent to kill the primary target *by killing everyone in the kill zone* is required.

In *Canizales*, the Supreme Court "emphasize[d] that going forward trial courts must exercise caution when determining whether to permit the jury to rely upon the kill zone theory. Indeed, we anticipate there will be relatively few cases in which the theory will be applicable and an instruction appropriate." (*Canizales*, *supra*, 7 Cal.5th at

11

p. 608.) Moreover, the Supreme Court has repeatedly explained that jury instructions on the kill zone theory *are never required.*[2] (*Stone*, *supra*, 46 Cal.4th at pp. 137-138; *Smith*, *supra*, 37 Cal.4th at p. 746; *Bland*, *supra*, 28 Cal.4th at p. 331, fn. 6.)

Given the Supreme Court's words of caution, the apparently ongoing difficulty in crafting an error-free instruction on the kill zone theory, and the absence of any requirement to give a kill zone instruction, it is not clear why it would ever be prudent to give such an instruction. It appears easy to commit error by instructing the jury on the kill zone theory, but it is literally impossible to err by declining to do so.[3]

E. *The Error Was Prejudicial*

*Canizales* held that the then-current version of CALCRIM No. 600 presented the jury with a "legally inadequate theory" (*Canizales*, *supra*, 7 Cal.5th at p. 613) because it provided "no adequate definition to enable the jury to determine whether the [kill zone] theory was properly applicable" (*id.* at p. 615). "[W]e therefore consider whether the

---

[2]     CALCRIM No. 600 introduces the kill zone instruction with the following bracketed note: "*<Give when kill zone theory applies>*." The note is erroneous, because kill zone instructions are never required. (*Stone*, *supra*, 46 Cal.4th at pp. 137-138; *Smith*, *supra*, 37 Cal.4th at p. 746; *Bland*, *supra*, 28 Cal.4th at p. 331, fn. 6.) An accurate note would be: *<The following instruction may but need not be given when the kill zone theory applies>*. In addition, to remove any potential ambiguity, it might be helpful if the bench notes for CALCRIM No. 600 included a direct statement that kill zone instructions are never required, citing *Stone*, *Smith*, and *Bland*.

[3]     If a court deems it appropriate to instruct a jury on the kill zone theory, the instruction could arguably be reduced to a single sentence (and without use of the term "kill zone") along something like the following lines: If, having considered all the circumstances of the attack, you find beyond a reasonable doubt that the defendant intended to kill <insert name of primary target> by killing everyone in the area in which <insert name of primary target> was located, then you may infer, but are not required to infer, that the defendant intended to kill everyone in that area.

12

error in instructing the jury was harmless beyond a reasonable doubt under *Chapman v. California* (1967) 386 U.S. 18." (*Rayford*, *supra*, 50 Cal.App.5th at p. 781.)

The People argue that the erroneous kill zone instruction was harmless beyond a reasonable doubt because "there is no way" that a properly instructed jury "could have concluded anything other than that the shooters intended to create and did create a zone of fatal harm." We disagree.

Contrary to the People's argument, the kill zone theory is categorically inapplicable to this case. There is no evidence that any person at the gathering in front of the Rodriguez house was the primary target of defendants' attack. There is no evidence that Sambrano knew or recognized anyone at the gathering or that the Rodriguez house had been defendants' planned destination. Moreover, there is no evidence that any particular person at the gathering did or said anything that might have led defendants to target a particular person when the shooting commenced. Instead, the evidence showed only that defendants began firing at the group because of the group's location within rival gang territory. Because there was no evidence of a primary target, the kill zone instruction should not have been given. (*Canizales*, *supra*, 7 Cal.5th at p. 608; *Cardenas*, *supra*, 53 Cal.App.5th at p. 118 ["without a primary target, the kill zone theory is categorically inapplicable"]; *Medina*, *supra*, 33 Cal.App.5th at p. 156 ["a kill zone instruction is not appropriate where a defendant fires a deadly weapon into a group of individuals with the intent to kill but without a primary target" "even if the defendant

13

intends to kill everyone in that group"]; *People v. Mariscal* (2020) 47 Cal.App.5th 129, 139 ["the kill zone theory only applies when there is an intended victim"].)

The absence of evidence of a primary target did not, however, enable the jury to determine that the kill zone theory did not apply, because the erroneous instruction did not tie the definition of a kill zone to a primary target. Rather, the jury might have applied the kill zone theory by reasoning that Sambrano "intend[ed] to kill everyone in a particular zone of harm or 'kill zone,'" even though as a matter of law the theory did not apply because there was no evidence of a primary target.

The prosecutor's closing argument exacerbated the problem. The prosecutor relied almost exclusively on the kill zone theory—which does not apply to this case at all—in arguing that Sambrano possessed the necessary mental state for attempted murder. Moreover, the prosecutor's argument erroneously articulated the kill zone theory in terms of a "zone of danger" and informed the jury that a primary target was not necessary: "So in this case, in going back to as I told you what I'll say 100 times, they had the intent to kill everyone there, ladies and gentlemen, within and without the residence. [¶] When you fire bullets like that, you create a zone of danger. It's called concurrent intent. You may have a target in mind, you may not, you may just be shooting to kill everyone, but you've set a zone of danger. And when you do that, you're attempting to kill everyone within that zone whether you know they're there or not." The prosecutor further explained: "If you open fire on a group of people with high-powered weapons, you've created a zone of danger. You may have no target in mind. Same with the plane. Let's

14

say [a particular person] just got on the plane and someone just wanted to blow it up. Doesn't matter; all right?  You still have the concurrent intent and you're still liable for everyone else that you tried to kill that's in that zone.  Does that make sense.  [¶] Does that make sense that when you have an area that you've opened fire on, you've created a zone of danger, a kill zone, and that anyone in there you're liable for?"

The prosecutor's argument erred in two ways:  It told the jury that the kill zone theory can apply even if there is no primary target ("You may have a target in mind, you may not"; "You may have no target in mind"), and it told the jury that creating a "zone of danger" is sufficient for attempted murder liability.  But a kill zone is not merely a zone of danger.  As the Supreme Court explained in *Canizales*, "the kill zone theory does not apply where 'the defendant merely subjected persons near the primary target to lethal risk.'"  (*Canizales*, *supra*, 7 Cal.5th at p. 607.)  Thus, as in *Canizales*, the prosecutor's description of the kill zone as a zone of danger "was significantly broader than a proper understanding of the theory permits.  Indeed, it essentially equated attempted murder with implied malice murder."  (*Id.* at p. 614.)  "Thus, the prosecutor's argument had the potential to mislead the jury to believe that the mere presence of a purported victim in an area in which he or she could be fatally shot is sufficient for attempted murder liability under the kill zone theory."  (*Ibid.*)  And the "legally erroneous argument was particularly prejudicial because the prosecutor relied almost exclusively on the kill zone theory in support of the attempted murder counts."  (*Cardenas*, *supra*, 53 Cal.App.5th at p. 118.)

15

Given that (1) the jury should not have been instructed on the kill zone theory at all, (2) the instruction's description of the kill zone theory was erroneous, (3) the prosecutor relied almost exclusively on the kill zone theory in arguing that Sambrano had the necessary mental state for attempted murder, and (4) the prosecutor's argument concerning the kill zone theory was likewise erroneous, we cannot conclude beyond a reasonable doubt that a properly instructed jury would not have reached a verdict more favorable to Sambrano. Accordingly, the convictions on the attempted murder counts must be reversed.

## DISPOSITION

The petition for writ of habeas corpus is granted. The six attempted murder convictions (counts 3, 4, 8, 9, 10, & 11) are vacated. We remand the matter to the trial court with directions to allow the People to choose whether to retry Sambrano on the attempted murder counts.

CERTIFIED FOR PUBLICATION

MENETREZ
J.


We concur:

CODRINGTON
Acting P. J.
FIELDS
J.

16