WEINGART, J.*
*716 I. INTRODUCTION
Defendants Antonio Silva and Oscar Medina, members of the Headhunters gang, were driving through the turf of a rival gang called Diamond Street. They lost control of their car and crashed into an apartment building. Bystanders gathered to look at the accident. Unable to move the disabled vehicle, Silva and Medina left and returned in another car. Silva got out of the car, pointed his gun, and started shooting at bystanders while Medina attempted to recover the crashed car. The people on the street (including two individuals, Juan Alcaraz and Jose Sanchez, who lived in the apartment building) fled in terror. None ended up being hit by the gunfire. Medina was still unable to move the car, and Silva and Medina then left separately. Silva left in the car in which he and Medina had returned to the accident scene. Before Medina left on foot, he screamed his gang's name and a derogatory term for the Diamond Street gang.
A jury convicted Silva and Medina on four counts of attempted murder and four counts of assault with a firearm. The jury also found true firearm-use and criminal street gang enhancements. On appeal, defendants both contend insufficient evidence supports the convictions as well as the gang enhancements imposed against them, that certain jury instructions were improper, and that certain sentencing errors need correction. Medina separately argues evidence of a previous drive-by shooting in which he participated was erroneously admitted. Medina also raises numerous sentencing issues: He claims his Romero[1] motion was improperly denied, his prison sentence of 62 years to life constitutes cruel and/or unusual punishment, two five-year serious felony enhancements were improperly imposed, and that his case must be remanded pursuant to recently enacted Senate Bills Nos. 620 and 1393 for the trial court to consider whether to strike the firearm-use enhancement and his prior serious felony conviction for sentencing purposes.
In the published portion of this opinion, we hold it was error to instruct the jury on a "kill zone" theory under the facts of this case. In the unpublished portion, we explain why the error was harmless, affirm the convictions and the firearm-use and gang enhancement findings, and address Medina's claims of sentencing error.
II. FACTUAL AND PROCEDURAL BACKGROUND
A. The Charges and Enhancement Allegations
Defendants were jointly charged in a consolidated second amended information with four counts of attempted murder ( Pen. Code[2] §§ 187, subd. (a), 664, counts 1-4) and four counts of assault with a firearm (§ 245, subd. (a)(2), counts 5-8) of Juan Alcaraz, Jose Sanchez, John Doe One and John Doe Two. As to the attempted murder counts, the information specially alleged that Silva and a principal had personally used and discharged a firearm. (§ 12022.53, subds. (b), (c) & (e).) As to the *717 assault with a firearm counts, the information alleged Silva had personally used a firearm (§ 12022.5, subd. (a)).
The attempted murders and aggravated assaults were alleged to have been committed for the benefit of a criminal street gang (§ 186.22, subd. (b).)[3] Finally, as to all counts, the information specially alleged Medina had suffered three prior serious or violent felony convictions within the meaning of the three strikes law (§§ 667, subds. (b)-(i) and 1170.12) and section 667, subdivision (a)(1), and Silva had suffered one prior serious or violent felony conviction within the meaning of section 667, subdivision (a)(1) and had previously served two separate prison terms for felonies (§ 667.5, subd. (b)).
B. Summary of Trial Evidence
1. The Shooting
In May 2016, Juan Alcaraz lived in an apartment building on Boylston Street in Los Angeles. As the son of the building manager, Alcaraz had access to the live video feeds from the building's outside security cameras.
On the night of May 29, 2016, Alcaraz was inside the apartment building when he heard and felt something hit the building. Alcaraz checked the security camera feed and saw a Chevy Cavalier had crashed into the building. Alcaraz went outside. He saw Silva run from the car and then return to try and help Medina, who was attempting to drive the car away.[4] When their efforts failed, defendants fled from the scene on foot.
Alcaraz's family and neighbors, including children, began coming outside. Minutes later, Alcaraz noticed a Scion automobile rapidly approaching the apartment building. Before the car came to a complete stop, the doors opened and defendants jumped out. Silva started shooting at Alcaraz and other bystanders-adults and children-who were directly in his line of fire. Alcaraz testified he was five to ten feet away and the other bystanders were 20 feet away from Silva at this point. Bystanders ran down the sidewalk away from Silva, funneled between the apartment building on one side and a row of parked cars on the other. Alcaraz heard six to eight gunshots before Silva stopped firing and left in the Scion.[5] The gunfire did not strike any onlookers or the apartment building.
Medina remained behind with the Chevy Cavalier, but was still unable to drive it. He began walking and screaming, "Headhunters gang, they own this turf" and "This is my neighborhood. This is Headhunters." Medina also yelled that he was not afraid and "F**k Diapers," which Alcaraz understood was a derogatory term for Diamond Street gang members. Medina then left on foot.
Jose Sanchez also lived in the apartment building on May 29, 2016. He and Alcaraz were the first two people to venture outside after the Chevrolet Cavalier crashed into the building. Sanchez saw the Scion speeding toward the apartment building.
*718 When the car was about 15 or 20 feet away, Sanchez heard a gunshot and ran to the recessed front porch of the apartment building. Adults and children were running and screaming. Sanchez heard four or five more gunshots in quick succession. When the shooting stopped, Sanchez heard a man say, "F**k Diamond, Headhunters."
Three video recordings from the building's security cameras were played for the jury during trial. Those recordings corroborated the eyewitness testimony described above.[6]
2.-3.**
C. The Verdicts and Sentencing
The jury convicted defendants as charged and found true the firearm-use and gang enhancement allegations. In a bifurcated proceeding, defendants each admitted the prior conviction allegations. Prior to sentencing, the trial court denied Medina's motion to dismiss his prior strike convictions ( Romero , supra , 13 Cal.4th 497, 53 Cal.Rptr.2d 789, 917 P.2d 628 ; § 1385). The court sentenced Silva to an aggregate term of 54 years to life in state prison, and Medina to an aggregate term of 62 years to life.
III. DISCUSSION
A. Challenges to the Sufficiency of the Evidence
1. There Was Sufficient Evidence to Support the Convictions for Attempted Murder of Alcaraz and Sanchez
Defendants first challenge the sufficiency of the evidence supporting the convictions for attempted murder of Alcaraz and Sanchez. In assessing this claim, we view the evidence in the light most favorable to the judgment and presume in support of the judgment the existence of every fact the jury could reasonably deduce from the evidence. ( People v. Zamudio (2008) 43 Cal.4th 327, 357, 75 Cal.Rptr.3d 289, 181 P.3d 105 ; accord, People v. Manibusan (2013) 58 Cal.4th 40, 87, 165 Cal.Rptr.3d 1, 314 P.3d 1.)
A conviction for attempted murder requires proof that the defendant intended to kill the victim and a direct but ineffectual act toward accomplishing that goal. ( People v. Perez (2010) 50 Cal.4th 222, 229, 112 Cal.Rptr.3d 310, 234 P.3d 557 ( Perez ).) Defendants contend there was no substantial evidence of intent to kill because there was insufficient evidence of where the gun was pointed when fired, there was no evidence regarding where the bullets landed or their trajectory vis à vis the bystanders on the street, and no one was injured.
"[A] person who intends to kill can be guilty of attempted murder even if the person has no specific target in mind. An indiscriminate would-be killer is just as culpable as one who targets a specific person." ( People v. Stone (2009) 46 Cal.4th 131, 140, 92 Cal.Rptr.3d 362, 205 P.3d 272 ( Stone ).) Alcaraz testified that Silva pointed the gun at him and Sanchez (as well as others) when firing. The video evidence confirmed Alcaraz and Sanchez were down range and in the line of fire when Silva pulled the trigger. Alcaraz was five to ten feet away from Silva when Silva shot. Sanchez was 15 to 20 feet away.
Firing a gun at Alcaraz and Sanchez from such close range was substantial *719 evidence from which the jury could find a specific intent to kill, and at least one direct but ineffective step towards killing them. ( People v. Smith (2005) 37 Cal.4th 733, 742, 37 Cal.Rptr.3d 163, 124 P.3d 730 ["[T]he act of purposefully firing a lethal weapon at another human being at close range, without legal excuse, generally gives rise to an inference that the shooter acted with express malice."] ( Smith ).) The fact that no one was injured does not negate an intent to kill. ( Ibid . [fact that bullet missed its mark does not show lack of intent to kill]; People v. Chinchilla (1997) 52 Cal.App.4th 683, 690, 60 Cal.Rptr.2d 761 [fact that victim escaped death because of shooter's poor marksmanship does not necessarily establish a less culpable state of mind].)
2. Substantial Evidence Did Not Support Giving a Kill Zone Theory Instruction With Regard to the John Doe Attempted Murder Counts
"To be guilty of attempted murder, the defendant must intend to kill the alleged victim, not someone else." ( People v. Bland (2002) 28 Cal.4th 313, 328, 121 Cal.Rptr.2d 546, 48 P.3d 1107 ( Bland ); see also Smith , supra , 37 Cal.4th at p. 739, 37 Cal.Rptr.3d 163, 124 P.3d 730.) For purposes of an attempted murder charge, intent to kill does not transfer to nontargeted individuals. ( People v. McCloud (2012) 211 Cal.App.4th 788, 797, 149 Cal.Rptr.3d 902 ( McCloud ).) "Nonetheless, the kill zone theory, first approved by the Supreme Court in Bland , yields a way in which a defendant can be guilty of the attempted murder of victims who were not the defendant's 'primary target.' " ( Ibid . ) A conviction for attempted murder under a kill zone theory requires evidence that the defendant created a kill zone; that is, while targeting a specific person "the defendant tried to kill the targeted individual by killing everyone in the area in which the targeted individual was located .... [¶] In a kill zone case, the defendant does not merely subject everyone in the kill zone to lethal risk. Rather, the defendant specifically intends that everyone in the kill zone die." ( Id . at p. 798, 149 Cal.Rptr.3d 902, italics in original.)
The jury was instructed, and the People argued, the kill zone theory only with regard to the John Doe attempted murder counts. With regard to the John Does, the jury was instructed the People had to prove the defendants intended to kill John Doe One and Two, or alternatively under the kill zone theory intended to kill Alcaraz and Sanchez by killing everyone in the area in which Alcaraz and Sanchez were located (including Does One and Two).
"[I]t is error to instruct[ ] on a theory that is entirely unsupported by the evidence." ( People v. Burnett (1992) 9 Cal.App.4th 685, 690, 11 Cal.Rptr.2d 841.) Defendants contend the giving of a kill zone instruction was error because the evidence adduced at trial did not support it.[7] Defendants contend there were at least two evidentiary deficiencies that made a kill zone instruction inappropriate. First, defendants *720 point out that a kill zone instruction requires evidence of an intent to kill a specific primary target, and argue such evidence was lacking here. Second, defendants contend that even if Alcaraz and Sanchez were primary targets, there was insufficient evidence the deaths of Alcaraz and Sanchez were to be achieved by killing everyone fleeing from the scene.
We agree giving the jury a kill zone instruction was error. The kill zone theory "is not a legal doctrine requiring special jury instructions" but rather "is simply a reasonable inference the jury may draw in a given case." ( Bland , supra , 28 Cal.4th at p. 331, fn. 6, 121 Cal.Rptr.2d 546, 48 P.3d 1107.) The kill zone theory is one of concurrent intent-the defendant has the intent to kill a particular target, and the jury can infer from the method employed to attempt killing the primary target a concurrent intent to kill those around the primary target to ensure the primary target's death. ( Id. at p. 330, 121 Cal.Rptr.2d 546, 48 P.3d 1107.) Without a primary target, there cannot be concurrent intent because there is no primary intent to kill as to which the intent to kill others could be concurrent.
In addition to a primary target, there must be evidence of a specific intent to kill everyone in the kill zone surrounding the primary target-not some or most, but everyone. (E.g., Bland , supra , 28 Cal.4th at p. 329, 121 Cal.Rptr.2d 546, 48 P.3d 1107 ["The intent is concurrent ... when the nature and scope of the attack, while directed at a primary victim, are such that we can conclude the perpetrator intended to ensure harm to the primary victim by harming everyone in that victim's vicinity."]; Perez , supra , 50 Cal.4th at p. 232, 112 Cal.Rptr.3d 310, 234 P.3d 557 ; People v. Cardona (2016) 246 Cal.App.4th 608, 615, 201 Cal.Rptr.3d 189 ; McCloud , supra , 211 Cal.App.4th at pp. 799-800, 149 Cal.Rptr.3d 902 ; People v. Vang , (2001) 87 Cal.App.4th 554, 104 Cal.Rptr.2d 704.) Nor in a firearm case is the evidentiary defect with a kill zone instruction cured by reducing the number of attempted murder counts to no more than the number of shots fired, because regardless of the number of counts the defendant must intend to kill everyone in the kill zone, whether or not they are a charged victim. ( People v. Cardona , supra , 246 Cal.App.4th at pp. 614-615, 201 Cal.Rptr.3d 189.) We recognize that some fellow Courts of Appeal have held it sufficient to give a kill zone instruction if a defendant recognizes (or accepts the fact) that a natural and probable consequence of his or her act toward the primary target would be that anyone (as opposed to everyone) within the zone of harm could or would die. (E.g., People v. Windfield (2016) 3 Cal.App.5th 739, 760-761, 208 Cal.Rptr.3d 47, review granted January 11, 2017, S238073; People v. Adams (2008) 169 Cal.App.4th 1009, 1023, 86 Cal.Rptr.3d 915.) We respectfully disagree with this view, which we believe replaces the specific intent/express malice required for an attempted murder conviction with conscious disregard for life/implied malice, which Bland makes clear cannot support an attempted murder conviction. ( Bland , supra , 28 Cal.4th at pp. 327-328, 121 Cal.Rptr.2d 546, 48 P.3d 1107.[8] The kill zone theory *721 does not operate as an exception to the mental state requirement for attempted murder or as a means of bypassing that requirement. "Rather, it is simply a reasonable inference the jury may draw in a given case: a primary intent to kill a specific target does not rule out a concurrent intent to kill others." ( Bland at p. 331, fn. 6, 121 Cal.Rptr.2d 546, 48 P.3d 1107.)
A kill zone instruction is never required, and as numerous appellate cases attest, giving such an instruction can often lead to error. For example, a kill zone instruction is not appropriate where a defendant fires a deadly weapon into a group of individuals with the intent to kill but without a primary target. Nor, in the absence of a primary target, is a kill zone instruction appropriate even if the defendant intends to kill everyone in that group. Where there is no primary target, there is no concurrent intent and no basis for a kill zone instruction. It is further important to understand that while a kill zone instruction would not be appropriate, a defendant could still be convicted of attempted murder under these circumstances. A jury can reasonably conclude a defendant without a primary target who repeatedly shoots into a crowd with the intent to kill committed multiple counts of attempted murder. ( Stone , supra , 46 Cal.4th at pp. 138-140, 92 Cal.Rptr.3d 362, 205 P.3d 272 ; McCloud , supra , 211 Cal.App.4th at pp. 798-799, 149 Cal.Rptr.3d 902 ["the discussion in Stone makes clear that ... a defendant can be convicted of several attempted murders if he intended to kill several people, even if there were not particular people he intended to kill"].)
We accordingly take this opportunity to reiterate that the kill zone instruction is not appropriate in the absence of evidence indicating the defendant had a primary target, and the specific intent to kill everyone in the kill zone around the primary target to ensure the target's death. The theory does not mean the defendant merely subjected persons near the primary target to lethal risk. Rather, in a kill zone case, the defendant has a primary target and reasons he cannot miss that intended target if he kills everyone in the area in which the target is located. In the absence of such evidence, the kill zone instruction should not be given.
Viewing the evidence in the light most favorable to the judgment, there was no evidence the defendants here had a primary target. There was no preexisting relationship or prior incident between the defendants and Alcaraz or Sanchez, or any other evidence suggesting the defendants specifically targeted those two individuals when they returned to the apartment building. Alcaraz did not identify himself as a primary target, and testified that Silva pointed the gun at "the public," "[l]ittle kids, family, Sanchez, me [Alcaraz], at random, anybody" when firing. Sanchez did not identify himself as a primary target-he heard gunshots, but did not see the gun or where it was pointed. The video showed Silva aimed and fired into the crowd, and did not suggest Alcarez or Sanchez was a primary target.[9] The evidence was therefore insufficient to support *722 a kill zone theory, and it was error to give a kill zone instruction to the jury.
3.-5.***
B.-F.†
IV. DISPOSITION
The judgments of conviction and firearm-use and gang enhancement findings are affirmed. On remand, the trial court shall recalculate Medina's sentence to strike one of the five-year prior serious felony enhancements, determine whether to strike the two remaining prior serious felony enhancements under section 667, subdivision (a)(1) and/or the 20-year firearm-use enhancement under section 12022.53, subdivision (c), and reduce the sentence accordingly if appropriate. As to both defendants, the court shall stay the sentences on counts 5 through 8 for assault with a firearm under section 654. The court is directed to prepare new abstracts of judgment for both defendants, and forward the amended abstracts of judgment to the Department of Corrections and Rehabilitation.
We concur:
ROTHSCHILD, P. J.
CHANEY, J.

Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

People v. Superior Court (Romero ) (1996) 13 Cal.4th 497, 53 Cal.Rptr.2d 789, 917 P.2d 628 (Romero ).

Statutory references are to the Penal Code unless otherwise designated.

For simplicity, this opinion uses the shorthand phrase "to benefit a criminal street gang" to refer to crimes that according to the statute, are committed "for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members ...." (§ 186.22, subd. (b); see People v. Jones (2009) 47 Cal.4th 566, 571, fn. 2, 98 Cal.Rptr.3d 546, 213 P.3d 997.)

Police later discovered the car was owned by one of Medina's relatives.

Six spent .380 caliber casings were recovered at the crime scene.

We requested the video recordings from the trial court and have reviewed them in preparing this opinion. The recordings, filmed from three different locations, show different aspects of the events leading up to and after the shooting, as well as the shooting itself, without sound.

See footnote *, ante .

Although defendants did not object to the kill zone instruction, and the People contend this issue has been forfeited on appeal, we review any claim of instructional error that allegedly affects the defendants' substantial rights even in the absence of an objection. (§ 1259; People v. Smithey (1999) 20 Cal.4th 936, 976-977, fn. 7, 86 Cal.Rptr.2d 243, 978 P.2d 1171.) We can only determine if defendants' substantial rights were affected by deciding whether the instruction was given in error and, if so, whether the error was prejudicial. Because we find in the unpublished portion of this opinion that the kill zone instruction did not affect the defendants' substantial rights, we also conclude defendants' claim of ineffective assistance of counsel to be without merit.

Implied malice is " 'an intentional act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life.' " (People v. Lasko (2000) 23 Cal.4th 101, 107, 96 Cal.Rptr.2d 441, 999 P.2d 666.) With regard to those in a zone of harm around the primary target, we perceive little difference between that implied malice standard and one in which the defendant acts towards a primary target " 'despite the recognition, or with acceptance of the fact, that a natural and probable consequence of that act would be that anyone within [the kill] zone could or would die.' " (People v. Windfield , supra , 3 Cal.App.5th at p. 758, 208 Cal.Rptr.3d 47 ; People v. Adams , supra , 169 Cal.App.4th at p. 1023, 86 Cal.Rptr.3d 915.)

Even if there had been evidence of a primary target, the kill zone theory required an intent to kill everyone in the kill zone, not just John Doe One and Two, to achieve the death of the primary target. There was no evidence at trial of such an intent.

See footnote *, ante .

See footnote *, ante .