Filed 10/21/24  P. v. Echartea CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>MARCOS ANTONIO ECHARTEA,<br><br>Defendant and Appellant. | F086797<br><br>(Super. Ct. No. F19904149)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Fresno County.  Jonathan B. Conklin, Judge.

Brad J. Poore, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Louis M. Vasquez, Lewis A. Martinez, and Hannah Janigian Chavez, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Defendant Marcos Antonio Echartea was charged with the attempted murder of F.P., Jane Doe, and John Doe (Pen. Code,[1] §§ 187, subd. (a), 664 [count 1]); shooting at an occupied motor vehicle (§ 246 [count 2]); three counts of assault with a firearm (§ 245, subd. (a)(2) [counts 3, 4 & 5]); and possession of a firearm in violation of a restraining order, injunction, or protective order (§ 29825, subd. (b) [count 6]). The information further alleged: (1) as to count 1, the attempted murder was willful, deliberate, and premeditated (§ 664, subd. (a)); (2) as to counts 1 and 2, defendant personally and intentionally discharged a firearm and proximately caused great bodily injury to F.P. (§ 12022.53, subd. (d)) and twice personally and intentionally discharged a firearm (§ 12022.53, subd. (c)); (3) as to count 3, he personally inflicted great bodily injury on F.P., a child under the age of five (§ 12022.7, subd. (d)); and (4) as to counts 3 through 5, he personally used a firearm (§ 12022.5, subd. (a)). The information also asserted the following circumstances in aggravation: (1) the crime involved great violence, great bodily harm, or other acts disclosing a high degree of cruelty, viciousness, or callousness (Cal. Rules of Court, rule 4.421(a)(1)); (2) defendant's prior convictions are numerous or of increasing seriousness (*id.*, rule 4.421(b)(2)); (3) defendant was armed with or used a weapon at the time of the commission of the crime (*id.*, rule 4.421(a)(2)); (4) the victim was particularly vulnerable (*id.*, rule 4.421(a)(3)); and (5) defendant has engaged in violent conduct that indicates a serious danger to society (*id.*, rule 4.421(b)(1)).

Following a bench trial, the trial court found defendant guilty as charged. It found true all alleged enhancements and all alleged circumstances in aggravation except for numerous or increasingly serious prior convictions. Defendant was sentenced to life with the possibility of parole—plus 25 years to life for the section 12022.53, subdivision (d)

---

[1] Unless otherwise indicated, subsequent statutory citations refer to the Penal Code.

enhancement and 20 years for one section 12022.53, subdivision (c) enhancement—on count 1.[2] Execution of punishment on counts 2 through 5 was stayed pursuant to section 654. In connection with count 6, defendant received credit for time served.

On appeal, defendant makes three contentions. First, the trial court improperly considered the kill zone theory on count 1. Second, the evidence did not sufficiently support the attempted murder conviction on count 1. Third, the court erroneously imposed more than one enhancement under section 12022.53 on counts 1 and 2. We conclude substantial evidence justified the court's consideration of the kill zone theory as well as supported defendant's conviction on count 1. We also conclude the court erroneously imposed more than one section 12022.53 enhancement on counts 1 and 2.

## STATEMENT OF FACTS

### I. Prosecution's case-in-chief

a. *Testimony of H.M.*

H.M. lived with her mother, her siblings, her best friend Jane, and Jane's 10-month-old daughter F.P. On June 22, 2019, L.V.—a friend and neighbor across the street—hosted a birthday party in her front yard. H.M. and F.P. arrived at the party early in the afternoon while Jane was dropped off around "4:00 or 5:00" p.m. by her friend John, an "African-American male." Other guests included defendant and his brother R.E., who resided with L.V. During the party, H.M. took photographs on her cell phone. Images showed defendant wearing a "white tee shirt and red shorts" and R.E. wearing a "black tank top and jeans." H.M. recalled there was hard liquor at the party and defendant was intoxicated. She did not drink because she was "the one watching the kids and taking care of the babies."

---

[2] The court struck the second section 12022.53, subdivision (c) enhancement.

Sometime after midnight, H.M. brought F.P. inside L.V.'s house to sleep. H.M. went back to the party and hung out with her brother, Jane, L.V., defendant, and R.E. At around 3:30 a.m., H.M. and defendant went to the bathroom, where they hugged and engaged in "[a] little talk here and there." She ended up with his phone number. Sometime after 3:30 a.m., Jane retrieved F.P. and left with John in his black sedan. Jane sat in the front passenger's seat while holding F.P. H.M. walked home, took a quick shower, and waited next to the front door for Jane and F.P. to return.

At around 4:00 a.m., H.M. heard "[t]hree or four" gunshots. She saw defendant, who was wearing the same white T-shirt and red shorts, "at the corner" of a nearby intersection walking toward L.V.'s house. H.M. then saw R.E., who was wearing the same black tank top and jeans, "r[u]n[ning] out the house" and "telling [defendant] to go inside." R.E. warned "[t]he cops are coming," called defendant "stupid," and asked him, "Why did you do that?" L.V. eventually joined the men outside and the three "went back inside the house." Shortly thereafter, H.M. received a phone call from Jane and learned F.P. had been struck by a bullet. Later, H.M. spoke with law enforcement and identified defendant as the shooter.

b. *Testimony of Jane Doe*

Jane Doe and F.P. lived with H.M. and her family "for a few months" prior to the June 23, 2019 incident. On June 22, 2019, "right before the sun was coming down," Jane, F.P. and H.M. walked to L.V.'s house for a party "out front." At some point, Jane and F.P. left with John. Approximately an hour later, John brought them back, parked his car, and waited "outside the gate." He did not attend the party.

When "it was dark," F.P. "fell asleep inside [L.V.]'s room" and Jane "hung outside, talked with [H.M.] and ate some food." Beer and marijuana were available at the party, but Jane did not drink or smoke there. She noticed defendant—whom she met "a week before"—was also a party guest. Around 3:30 a.m., Jane entered L.V.'s house. Defendant approached her and "tried to pull [her] into the bathroom." Jane pulled her

4.

arm away, "walked the opposite way," and went back outside. About 10 minutes later, Jane entered the house again. As she was exiting, defendant—who was "sitting down on the front porch"—grabbed her arm and tried to get her to sit next to him. When Jane said "no" and walked away, defendant "started arguing with [her]." He said he was "mad" because she was "gonna pick a [B]lack guy over [him]."

Jane told H.M. she "was going to get [her] daughter and leave because there was drama" with defendant. She went inside the house and retrieved F.P. While Jane was going outside with F.P., she passed defendant. Jane made her way to John's car and sat in the front passenger's seat. F.P. was on her lap. Although Jane "lived across the street from [L.V.'s] house," she got in the car "to make it seem like [she, F.P., and John] were leaving" the neighborhood. John drove toward the nearby intersection, "turned right," and "made a U-turn." Heading back to the intersection, from approximately 40 feet away, Jane saw defendant "[o]n the corner." He was wearing "[a] white shirt" and "[r]ed shorts." As John proceeded down the street, defendant "speed walk[ed]" toward the car. Jane spotted a "shadow" in defendant's hand and then heard three gunshots. John "continued driving trying to get away" and Jane "started screaming" upon realizing F.P. "ha[d] been hit" "[o]n her head." En route to the hospital, they encountered a police officer "on the side of the road," "pull[ed] over," and sought his help.

c. *Testimony of Officer Zumkehr*

On June 23, 2019, at 4:05 a.m., Officer Zumkehr of the Fresno Police Department was in his patrol vehicle when he saw "a female passenger" in a passing black Audi sedan "hanging out of the passenger window." She was "trying to get [his] attention" by "wa[ving] her arms" and "screaming for help." Zumkehr initiated a traffic stop. After the sedan came to a halt, the driver—a "[B]lack male"—and the female passenger exited the car and approached Zumkehr's vehicle. The female was "carrying a small infant" and "crying hysterically." When Zumkehr ordered the pair to "get back inside," the driver exclaimed, "No, no. The baby has been shot, the baby's been shot." Zumkehr saw "a

5.

large amount of blood" on the female passenger and the infant. The latter exhibited "a gunshot wound to the forehead and an exit wound at the back of the head." Zumkehr requested "an emergency response from an ambulance" and then used gauze to "appl[y] light pressure to [the] forehead and to the back of [the] head to try to control [the] bleeding." Approximately five or six minutes later, an ambulance arrived and the child was transported to the hospital.

Zumkehr remained with the black Audi sedan. He examined the car and observed (1) a bullet hole on "the side window right next to where the driver would be sitting"; (2) a bullet hole "about 2 inches above" and "2 inches forward of" the rear passenger's door handle on the driver's side; (3) "a large quantity of coagulated blood" on the front passenger's seat; and (4) "blood spatter on the interior of the vehicle that went up onto the windows."

d. *Testimony of Officer Bahena*

On June 23, 2019, at approximately 4:10 a.m., Officer Bahena of the Fresno Police Department arrived at the scene of the shooting. He was "flagged down" by H.M., who told him she "hear[d] what sounded like gunshots at about 4:00 [a.m.]," "stepped out of the residence to see what was going on," and noticed defendant "was the only person out there at the time." H.M. declared, "It was him. He shot [the] baby. It was Marcos. He did it." At around 7:30 a.m., Bahena and other officers performed a "protective sweep" of L.V.'s house. They found defendant asleep in a bedroom wearing "a white tee shirt" and "red basketball shorts." He smelled of alcohol. Defendant was taken into custody.

e. *Testimony of Detective Mendes*

On June 23, 2019, at approximately 4:30 a.m., Detective Mendes of the Fresno Police Department arrived at the hospital, where he met Jane. Sometime after 5:00 a.m., he interviewed her. Jane stated "her ten month old baby had been shot in the head." Prior to the shooting, she and her best friend H.M. were at a party at L.V.'s house. At about 3:30 a.m., defendant—another partygoer—"attempted to pull [Jane] into the

6.

bathroom when they were inside the house by themselves," but she "was able to tell him she wasn't interested." Later, defendant "tried to pull her down into his lap" "as she walked passed." Jane added defendant had been drinking, which affected his speech.

Mendes subsequently interviewed defendant at police headquarters. Defendant stated he was at a party where he "was hitting on girls" and "everybody was party[ing] and drinking." He remembered "there was a guy there, a [B]lack male there, who was making comments about the Dog Pound gang," but no altercation occurred. Defendant denied shooting anyone.

### f. *Testimony of Detective Brown*

On June 23, 2019, at 5:16 a.m., Detective Brown of the Fresno Police Department arrived at the scene of the shooting. He searched for but could not find any expended shell casings in the vicinity. Brown spoke with a neighbor and obtained surveillance camera footage of the shooting. This footage captured the gunman firing at a moving vehicle at least twice as the vehicle was passing him. At 9:57 a.m., Brown spoke with H.M. An infield showup was conducted and H.M. identified defendant as the perpetrator.

On June 24, 2019, Brown searched John's impounded car. He opened the rear passenger's door on the driver's side and found a "slug," i.e., "the projectile part of the bullet that fires through the barrel and out of the firearm." A "directional rod" inserted into the bullet hole in the rear passenger's door on the driver's side indicated "the shooter was standing back behind the vehicle when the person fired."

### g. *Other evidence*

ShotSpotter, an "acoustic gunshot dete[c]tion and location system" consisting of "a number of microphone sensors" covering particular zones in the city, registered three gunshots at the scene of the shooting on June 23, 2019, at 4:00 a.m. "Each round was fired in less than half a second of each other."

7.

After defendant was apprehended, his hands were tested for gunshot residue. An analysis revealed the presence of gunshot residue particles on both hands.

## II. Defense's case-in-chief

### a. *Testimony of R.E.*

R.E. testified he and defendant attended L.V.'s party. Both drank alcohol and defendant "was drunk." During the party, defendant mainly sat on the front porch because he "didn't know no one at the party besides [R.E.]" H.M. "show[ed] interest" in defendant and even "tried to kiss" him, but R.E. "pulled her off of him and told h[er] to get off him." At some point, Jane approached the brothers, but she only spoke to R.E. R.E. never saw defendant and Jane going inside L.V.'s house and never saw defendant pulling Jane's arm. He noticed "a random [B]lack guy coming to the gate multiple times."

R.E. heard gunshots when he was inside the house and defendant "was outside."

## DISCUSSION

## I. Substantial evidence justified the trial court's consideration of the kill zone theory.

### a. *Background*

Both parties submitted requests for CALCRIM No. 600 (Attempted Murder). Following close of evidence, the trial court explained it had "asked the parties to discuss what they propose to be applicable jury instructions" "to clarify the law applicable in the case." The court remarked: "I recognize this is a little bit unusual in the sense that the Court is sitting as the fact finder, but I'm also the law finder." Prior to closing arguments, the court indicated it had "provided counsel with a set of jury instructions," including CALCRIM No. 600, "for the purposes of consideration of each of the elements of each of the offenses."

CALCRIM No. 600 read in part:

"A person may intend to kill a primary target and also secondary targets within a zone of fatal harm or 'kill zone.'  A 'kill zone' is an area in which the defendant used lethal force that was designed and intended to kill everyone in the area around the primary target.

"In order to convict the defendant of the attempted murder of [F.P.], Jane Doe and John Doe, the People must prove that the defendant not only intended to kill Jane Doe but also either intended to kill [F.P.], Jane Doe and John Doe, or intended to kill everyone within the kill zone.

"In determining whether the defendant intended to kill [F.P.], Jane Doe and John Doe, the People must prove that (1) the only reasonable conclusion from the defendant's use of lethal force, is that the defendant intended to create a kill zone; and (2) [F.P.], Jane Doe and John Doe was [*sic*] located within the kill zone.

"In determining whether the defendant intended to create a 'kill zone' and the scope of such a zone, you should consider all of the circumstances including, but not limited to, the following:

- "● The type of weapon used;

- "● The number of shots fired;

- "● The distance between the defendant and [F.P.], Jane Doe and John Doe;

- "● The distance between [F.P.], Jane Doe and John Doe and the primary target.

"If you have a reasonable doubt whether the defendant intended to kill [F.P.], Jane Doe and John Doe or intended to kill Jane Doe by killing everyone in the kill zone, then you must find the defendant not guilty of the attempted murder of [F.P.], Jane Doe and John Doe."

The court found defendant guilty of attempted murder on count 1, concluding he "intended to kill everyone within the 'kill zone' of the car, with premeditation, willfully and deliberately."

9.

b. *Analysis*

"To prove the crime of attempted murder, the prosecution must establish 'the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing.' [Citation.] When a single act is charged as an attempt on the lives of two or more persons, the intent to kill element must be examined independently as to each alleged attempted murder victim; an intent to kill cannot be 'transferred' from one attempted murder victim to another under the transferred intent doctrine." (*People v. Canizales* (2019) 7 Cal.5th 591, 602 (*Canizales*).)

However, our Supreme Court recognized "a shooter may be convicted of multiple counts of attempted murder on a 'kill zone' theory where the evidence establishes that the shooter used lethal force designed and intended to kill everyone in an area around the targeted victim (i.e., the 'kill zone') as the means of accomplishing the killing of that victim. . . ." (*People v. Smith* (2005) 37 Cal.4th 733, 745–746, citing *People v. Bland* (2002) 28 Cal.4th 313, 329–330.) The "kill zone" or "concurrent intent" theory applies only where the trier of fact concludes "(1) the circumstances of the defendant's attack on a primary target, including the type and extent of force the defendant used, are such that the only reasonable inference is that the defendant intended to create a zone of fatal harm—that is, an area in which the defendant intended to kill everyone present to ensure the primary target's death—around the primary target and (2) the alleged attempted murder victim who was not the primary target was located within that zone of harm. Taken together, such evidence will support a finding that the defendant harbored the requisite specific intent to kill both the primary target and everyone within the zone of fatal harm." (*Canizales*, *supra*, 7 Cal.5th at p. 607.)

"In determining the defendant's intent to create a zone of fatal harm and the scope of any such zone, the [trier of fact] should consider the circumstances of the offense, such as the type of weapon used, the number of shots fired (where a firearm is used), the distance between the defendant and the alleged victims, and the proximity of the alleged

10.

victims to the primary target. Evidence that a defendant who intends to kill a primary target acted with only conscious disregard of the risk of serious injury or death for those around a primary target does not satisfy the kill zone theory. . . . [T]he kill zone theory does not apply where 'the defendant merely subjected persons near the primary target to lethal risk. Rather, in a kill zone case, the defendant has a primary target and reasons [that] he cannot miss that intended target if he kills everyone in the area in which the target is located.' " (*Canizales*, *supra*, 7 Cal.5th at p. 607.)

A kill zone instruction is warranted where "substantial evidence exists from which the [trier of fact] could draw the required inference." (*People v. Mumin* (2023) 15 Cal.5th 176, 200 (*Mumin*).) "In the absence of such evidence, the kill zone instruction should not be given." (*People v. Medina* (2019) 33 Cal.App.5th 146, 156 (*Medina*); accord, *Canizales*, *supra*, 7 Cal.5th at p. 607.)

"Substantial evidence supports a decision if, upon 'review[ing] the whole record in the light most favorable to the judgment,' there is 'evidence that is reasonable, credible, and of solid value' underlying the challenged act. [Citation.]" (*People v. Brooks* (2024) 99 Cal.App.5th 323, 339; see, e.g., *Medina*, *supra*, 33 Cal.App.5th at p. 156.) "The substantial evidence standard 'gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.' [Citation.]" (*Mumin*, *supra*, 15 Cal.5th at p. 202; see *People v. Webb* (2023) 90 Cal.App.5th 660, 668 [substantial evidence standard "applies following a court trial"].)

The record—viewed in the light most favorable to the judgment—shows defendant was "hitting on girls" at L.V.'s party prior to the shooting. In particular, he made unwanted advances toward Jane, who rebuffed him twice. After the second rejection, when Jane refused to sit next to him, defendant said he was "mad" because she was "gonna pick a [B]lack guy over [him]." (Cf. *Medina*, *supra*, 33 Cal.App.5th at p. 156 ["no preexisting relationship or prior incident" between the defendants and the

11.

alleged primary targets]; see *People v. Smith* (2005) 37 Cal.4th 733, 741 ["[E]vidence of motive is often probative of intent to kill."].) Defendant was mindful of John, the African-American male who had dropped Jane off at the party earlier in the evening, parked his car, and waited "outside the gate" for her. As a result of her encounters with defendant, Jane wanted to leave. After she retrieved her infant daughter F.P. from inside L.V.'s house and while she was going outside, she passed defendant. Jane went to John's car and sat in the front passenger's seat with F.P. on her lap. The plan was for John to drop off Jane and F.P. at their residence. Meanwhile, defendant—who was armed with a gun—positioned himself at the intersection, where he would have a clear view of John's approaching car following a U-turn. (See *People v. Smith*, *supra*, at p. 741 ["[I]t is well settled that intent to kill or express malice, the mental state required to convict a defendant of attempted murder, may in many cases be inferred from the defendant's acts and the circumstances of the crime."].)

As John was proceeding down the street, defendant "speed walk[ed]" toward the car. Then, as the car was passing by him, defendant fired three times in rapid succession. (Cf. *Canizales*, *supra*, 7 Cal.5th at p. 611 [the shooter opened fire from at least 100 feet away].) Being inside the vehicle, Jane, John, and F.P. were in a "a confined space" (*Mumin*, *supra*, 15 Cal.5th at p. 204), were "in close proximity to each other" (*ibid.*), and "would have limited means of escape" (*Canizales*, *supra*, at p. 611). (Cf. *Mumin* at p. 205 [the defendant "fired three shots from a handgun into an open area, where the alleged primary and secondary targets were positioned at least 25 feet apart"]; *Canizales*, *supra*, at p. 611 [shooting "occurred at a block party on a wide city street"].) "The fact . . . defendant chose to shoot into a confined space or at a defined group in close proximity to each other strengthens the inference that the creation of a kill zone was intended. In that sense, the size of the confined space or the close grouping of the targets helps define the intended zone of fatal harm." (*Mumin*, *supra*, at p. 204, fn. omitted.) While three gunshots may not constitute a "flurry" (*People v. Bland*, *supra*, 28 Cal.4th at

12.

p. 331) or "hail" (*People v. Tran* (2018) 20 Cal.App.5th 561, 567) of bullets, our Supreme Court rejected the notion "a kill zone can never be created with a relatively small number of shots" (*Mumin*, *supra*, at p. 204). When "considered together with the area into which they [we]re fired" (*Mumin*, *supra*, at p. 204) and the number of victims involved (cf. *People v. McCloud* (2012) 211 Cal.App.4th 788, 799–800 [kill zone theory inapplicable absent evidence demonstrating the defendants could kill 46 people with 10 bullets]), the three gunshots were "sufficient to create a zone of fatal harm around a primary target in a confined space or in the midst of a tight group" (*Mumin*, *supra*, at p. 205). Finally, F.P. sustained a gunshot wound. While "the effectiveness or ineffectiveness of [a] defendant's chosen method of attack" is not determinative (*Canizales*, *supra*, at p. 611), injury—or lack thereof—"is one factor to consider in determining whether the defendant intended to kill secondary targets" (*Mumin*, *supra*, at p. 205).

We conclude there was substantial evidence from which the trial court could only infer defendant "intended to kill a primary target" (*Mumin*, *supra*, 15 Cal.5th at p. 203), i.e., Jane; "he concurrently intended to achieve that goal by killing others in the fatal zone he create[d]" (*ibid.*); and F.P. and John were "in that zone" (*ibid.*).[3]

## II. Substantial evidence supported defendant's attempted murder conviction on count 1.

"To determine the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the prosecution to determine whether it contains [substantial] evidence that is reasonable, credible and of solid value, from which a rational trier of fact could find that the elements of the crime were established beyond a reasonable doubt." (*People v. Tripp* (2007) 151 Cal.App.4th 951, 955.) We "presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." (*People v. Redmond* (1969) 71 Cal.2d 745, 755.) "We need not be

---

[3] Having considered the argument on the merits, we need not address the Attorney General's claim of forfeiture.

13.

convinced of the defendant's guilt beyond a reasonable doubt; we merely ask whether ' "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." [Citation.]' " (*People v. Tripp*, *supra*, at p. 955, italics omitted.) "This standard of review . . . applies to circumstantial evidence. [Citation.] If the circumstances, plus all the logical inferences the [trier of fact] might have drawn from them, reasonably justify the [trier of fact]'s findings, our opinion that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment." (*Ibid.*)

"Before the judgment of the trial court can be set aside for insufficiency of the evidence to support the verdict of the [trier of fact], it must clearly appear that upon no hypothesis what[so]ever is there sufficient substantial evidence to support it." (*People v. Redmond*, *supra*, 71 Cal.2d at p. 755.) " 'Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. [Citation.] We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence.' " (*People v. Lee* (2011) 51 Cal.4th 620, 632.)

On appeal, defendant contends his actions did not "suggest that he intended to create a kill zone in order to effectuate the death of [Jane Doe]" and "[t]here is no reasonable, credible, and of solid value evidence in the record . . . that [he] intended to kill either [F.P.] or John Doe." We disagree. As we previously discussed, albeit in the context of whether the trial court's initial consideration of the kill zone theory was proper, the record contained substantial evidence from which the court could only infer defendant intended to kill Jane, he intended to ensure Jane's death by creating a zone of fatal harm around her and killing everyone within the zone, and both F.P. and John were within the zone. (See *ante*, at pp. 11–13.) This evidence is likewise sufficient to support defendant's attempted murder conviction.

**III.** **The trial court erroneously imposed more than one section 12022.53 enhancement on counts 1 and 2.**

   a. *Background*

   As noted, defendant was convicted of attempted murder (count 1) and shooting at an occupied motor vehicle (count 2), among other things.  In connection with these counts, the court found defendant (1) personally and intentionally discharged a firearm and proximately caused great bodily injury to F.P. (§ 12022.53, subd. (d)); (2) personally and intentionally discharged a firearm toward Jane (§ 12022.53, subd. (c)); and (3) personally and intentionally discharged a firearm toward John (§ 12022.53, subd. (c)).

   At an August 28, 2023 sentencing hearing, the court imposed life with the possibility of parole—plus 25 years to life for the section 12022.53, subdivision (d) enhancement and 20 years for one section 12022.53, subdivision (c) enhancement—on count 1.  It reasoned:

> "The [Court] found true the 12022.53(d), which is the use of a firearm resulting in serious bodily injury to the young child, which is additional 25 years to life.  [¶]  The [Court] also found two additional 12022.553(c) [*sic*] enhancements.  That's the use of a firearm against both mother and the male driver of the vehicle.
>
> "So, candidly, in an abundance of caution only and to establish that I am exercising discretion as I'm required to do, I'm going to strike one of those 12022.53(c) enhancements, because it appears to the Court . . . the Defendant aimed the gun at the car intending to shoot – the facts establish intending to shoot the mother.
>
> "The male driver of the car was, for lack of a better description, an innocent bystander, as was the child, but the child was struck.  So the Court cannot fathom a reason to dismiss the 12022.53(d) involving the child, but considering the fact that the gun was aimed at the mother and I believe therefore the 12022.53(c) against the mother is clearly applicable.
> [¶] · · · [¶]
>
> "It is not in the furtherance of justice to dismiss the enhancement involving the child or the mother.  For the reasons stated, I will dismiss the second 12022.53(c) involving the driver."

15.

The court imposed five years—plus 25 years to life for the section 12022.53, subdivision (d) enhancement and 20 years for one section 12022.53, subdivision (c) enhancement—on count 2, pointing out it "will likewise strike the second 12022.53(c)." It stayed execution of punishment on count 2 pursuant to section 654.

 b. *Analysis*

Section 12022.53 reads in part:

"(a) This section applies to the following felonies:

> "(1) Section 187 (murder). [¶] . . . [¶]

> "(17) Any felony punishable by death or imprisonment in the state prison for life.

> "(18) Any attempt to commit a crime listed in this subdivision other than an assault. [¶] . . . [¶]

"(c) Notwithstanding any other law, a person who, in the commission of a felony specified in subdivision (a), personally and intentionally discharges a firearm, shall be punished by an additional and consecutive term of imprisonment in the state prison for 20 years.

"(d) Notwithstanding any other law, a person who, in the commission of a felony specified in subdivision (a), Section 246, or subdivision (c) or (d) of Section 26100, personally and intentionally discharges a firearm and proximately causes great bodily injury . . . or death, to a person other than an accomplice, shall be punished by an additional and consecutive term of imprisonment in the state prison for 25 years to life. [¶] . . . [¶]

"(f) Only one additional term of imprisonment under this section shall be imposed per person for each crime. If more than one enhancement per person is found true under this section, the court shall impose upon that person the enhancement that provides the longest term of imprisonment. . . . [¶] . . . [¶]

"(h) The court may, in the interest of justice pursuant to Section 1385 and at the time of sentencing, strike or dismiss an enhancement otherwise required to be imposed by this section. . . ."

Our Supreme Court held "section 12022.53 requires that, after a trial court imposes punishment for the section 12022.53 firearm enhancement with the longest term of

imprisonment, the remaining section 12022.53 firearm enhancements . . . that were found true for the same crime must be imposed and then stayed." (*People v. Gonzalez* (2008) 43 Cal.4th 1118, 1130.)

With respect to count 1, both subdivisions (c) and (d) of section 12022.53 apply to "the commission of a felony specified in subdivision (a) . . . ." Attempted murder is one such felony. (See § 12022.53, subd. (a)(1), (18).) In view of section 12022.53, subdivision (f) and the *Gonzalez* case, the court below should have stayed the section 12022.53 subdivision (c) enhancement.[4]

With respect to count 2, section 12022.53, subdivision (d) applies to "the commission of a felony specified in subdivision (a), *Section 246*, or subdivision (c) or (d) of Section 26100 . . . ." (Italics added.) On the other hand, section 12022.53, subdivision (c) only applies to "the commission of a felony specified in subdivision (a) . . . ." Shooting at an occupied motor vehicle—a violation of section 246—is not one of the felonies enumerated in subdivision (a). (See § 12022.53, subd. (a)(1)–(16).) Furthermore, this crime "carries a maximum sentence of seven years in prison" (*People v. Jones* (2009) 47 Cal.4th 566, 572; accord, § 246 ["three, five, or seven years"]) and—by itself—is not a "felony punishable by death or imprisonment in the state prison for life" (§ 12022.53, subd. (a)(17)). (Cf. *People v. Jones*, *supra*, at p. 578 [§ 186.22, subd. (b)(4) sets forth alternate penalty of life imprisonment for § 246 violation committed to benefit a criminal street gang].) Thus, the court below should not have imposed a section 12022.53, subdivision (c) enhancement.

---

[4] The Attorney General concedes this point.

17.

**<u>DISPOSITION</u>**

The trial court is directed to stay the section 12022.53 subdivision (c) enhancement imposed on count 1 and strike the section 12022.53 subdivision (c) enhancement imposed on count 2.  In all other respects, the judgment is affirmed.


DETJEN, Acting P. J.

WE CONCUR:


SMITH, J.


SNAUFFER, J.