Filed 2/4/26  P. v. Garcia CA6

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>RUBI FLORENCIA GARCIA,<br><br>    Defendant and Appellant. | H052749<br>(Monterey County<br> Super. Ct. No. SS031841B) |

This is defendant Rubi Florencia Garcia's third appeal related to a May 2003 freeway shooting.

In December 2004, a jury convicted Garcia of first degree murder (Pen. Code,[1] §§ 187, subd. (a), 189) and found true a firearm enhancement (§ 12022, subd. (a)(1)).

In 2006, this court reversed the judgment.  (*People v. Garcia* (July 6, 2006, H028474) [nonpub. opn.] (*Garcia I*).)

On remand, Garcia pleaded guilty to second degree murder and admitted an allegation that the offense was committed by means of shooting

---

[1] All further unspecified statutory references are to the Penal Code.

a firearm from a motor vehicle (§ 190, subd. (d)). The trial court sentenced Garcia to 20 years to life in prison.

In 2019, Garcia, in propria persona, filed a petition for resentencing under former section 1170.95 (now designated as section 1172.6) (petition). The trial court denied the petition at the prima facie stage. Garcia appealed.

In 2020, this court reversed the trial court's order denying Garcia's petition and remanded the matter for further proceedings. (*People v. Garcia* (Dec. 30, 2020, H047574) [nonpub. opn.] (*Garcia II*).)

In November 2024, following an evidentiary hearing, the trial court denied Garcia's petition, finding that Garcia directly aided and abetted the homicide with an intent to kill.

On appeal, Garcia's appointed appellate counsel filed a brief under *People v. Delgadillo* (2022) 14 Cal.5th 216 (*Delgadillo*). Garcia filed a request for substitute appointed counsel and a supplemental brief on the merits. Garcia's filings each assert that there is insufficient evidence to support the trial court's denial of the petition and that there are grounds for appellate counsel to prepare a habeas corpus petition alleging ineffective assistance of defense counsel (IAC) at the section 1172.6 proceeding.

For the reasons explained below, we affirm the trial court's order denying Garcia's petition, and we deny Garcia's request for substitute appointed counsel.

2

# I. FACTS AND PROCEDURAL BACKGROUND[2]

A. *Procedural History*

    1. <u>2004 Trial</u>

In October 2003,[3] the Monterey County District Attorney filed an information charging Garcia and codefendant Glenn Barry Spillman with the May 21 first degree murder of Javier Soto (§§ 187, subd. (a), 189; count 1). The information alleged that the murder was perpetrated by means of discharging a firearm from a motor vehicle (§ 189). As to Garcia, the information alleged that the offense was perpetrated by means of shooting a firearm from a motor vehicle with the intent to inflict great bodily injury (§ 190, subd. (d)) (section 190(d) allegation) and that a principal was armed with a handgun during the commission of the offense (§ 12022, subd. (a)(1)).[4]

In December 2004, following a joint jury trial with codefendant Spillman, the jury convicted Garcia of first degree murder and found true the attached firearm enhancement. The jury failed to reach a verdict for Spillman, and the trial court declared a mistrial as to him. The trial court sentenced Garcia to 25 years to life in prison, plus one year for the firearm enhancement.

---

[2] This court's prior unpublished opinions in *Garcia I* and *Garcia II* are included in the appellate record. This background information is taken from those opinions and other documents in the instant appellate record.

[3] Unless otherwise indicated, all dates were in 2003.

[4] At the time of the offense, Garcia was 23 years old and identified as female. At the time of the instant petition, Garcia identified as male. In his supplemental brief, Garcia refers to himself using female pronouns when describing trial testimony, as do we. We otherwise refer to Garcia using male pronouns.

2. <u>Direct Appeal</u>

In July 2006, a different panel of this court reversed the judgment. (*Garcia I*, *supra*, H028474.) The panel concluded the trial court erred under Evidence Code section 352 by allowing Spillman to introduce gang expert testimony that the shooting was gang motivated. The admitted testimony supported Spillman's defense that Garcia, not Spillman, fired the gun from a pickup truck at the victim. (*Ibid.*)

When discussing the issue of prejudice, the panel stated: "Respondent argues that the erroneous admission of the gang motive evidence was harmless because 'the evidence established overwhelmingly that [Garcia] intentionally maneuvered the truck so that the shooter – whether it was [Garcia] or Spillman – could fire at the [victim's] Honda.' This argument dramatically overstates the strength of the evidence on this point. For [Garcia] to be convicted as an aider and abettor, the prosecution had to prove that, with knowledge of Spillman's unlawful purpose and the intent of facilitating the commission of the crime, [Garcia] aided its commission. . . . The only direct evidence on the issue of whether [Garcia] intended to aid Spillman was Antonio G[.[5]]'s testimony that [Garcia] was trying to pass the Honda when Spillman reached behind [Garcia] and fired the gun. This testimony is supported by the forensic expert's testimony that the 'likely scenario' was that the three shots were fired from 'back to front.' . . . The testimony concerning [Garcia]'s aggressive driving and rude behavior is troubling but hardly establishes that [Garcia] intentionally maneuvered the truck to assist the shooter." (*Garcia I*, *supra*, H028474, fn. omitted.)

---

[5] We refer to civilian trial witnesses by first name and the first initial of their last name and subsequently only by first name to protect their privacy interests. (Cal. Rules of Court, rule 8.90(b)(10).)

4

The panel further explained: "Without the gang expert testimony, the jury would have had an entirely different view of the evidence concerning aiding and abetting. The evidence that [Garcia] aided Spillman by matching speeds with the Honda is far from overwhelming. The gang evidence evoked a compelling emotional bias against [Garcia]. As Shirley [J.] testified, 'There wasn't anything that day that gave me the impression it was a gang shooting. I was afraid it was a gang shooting because it was Salinas.' We conclude that there is a reasonable probability that [Garcia] would have obtained a more favorable result absent [the expert]'s testimony that the shooting was gang motivated." (*Garcia I, supra*, H028474.)

### 3. 2006 Guilty Plea

In September 2006, Garcia pleaded guilty to second degree murder (count 1, as amended) and admitted the section 190(d) allegation. The trial court sentenced Garcia to 20 years to life in prison.

### 4. Section 1172.6 Proceedings

In 2019, in Senate Bill No. 1437 (2017–2018 Reg. Sess.) (Senate Bill 1437), the Legislature acknowledged "a need for statutory changes to more equitably sentence offenders in accordance with their involvement in homicides." (Stats. 2018, ch. 1015, § 1, subd. (b) [eff. Jan. 1, 2019].) To that end, "Senate Bill 1437 significantly changed the scope of murder liability for defendants who did not actually kill or intend to kill anyone, including those prosecuted on a felony-murder theory." (*People v. Wilson* (2023) 14 Cal.5th 839, 868 (*Wilson*); see also *People v. Curiel* (2023) 15 Cal.5th 433, 448–449 (*Curiel*); § 188, subd. (a)(3).) "The bill also altered murder liability under the natural and probable consequences doctrine." (*Wilson*, at p. 868, fn. 8; see § 188.) Further, the Legislature added section 1170.95 (later renumbered as section 1172.6), allowing a person convicted of felony murder or murder

5

under the natural and probable consequences doctrine to file a petition with the sentencing court to vacate the conviction and be resentenced. (Stats. 2018, ch. 1015, § 4.)

In March 2019, Garcia filed a petition for resentencing. The trial court appointed defense counsel to represent Garcia and denied the petition without issuing an order to show cause. (See § 1172.6, subd. (c).) On appeal, a different panel of this court reversed and remanded for further proceedings on Garcia's petition. (*Garcia II*, *supra*, H047574.)

On remand, Garcia, through counsel, filed an "Opening Trial Brief" (trial brief) with attached exhibits. The exhibits included the testimony of eight witnesses from Garcia's 2004 trial, two police reports containing postcrime statements by Garcia,[6] and a May 2024 psychological report concerning Garcia, authored by Rahn Y. Minagawa, Ph.D. (Dr. Minagawa's report). Garcia also filed a memorandum concerning permissible evidence at a section 1172.6 evidentiary hearing.

The district attorney filed the "People's Evidence for [section] 1172.6 Hearing," proposing admission of testimony provided by 23 witnesses at Garcia's 2004 trial (including the eight witnesses that Garcia had identified previously).

---

[6] One report states: "While [Officer G.E. Marshall] was walking Garcia back to [the officer's] vehicle [Garcia] stated 'I didn't do anything. He just shot and I was driving. I didn't know he was going to do it.' " The other report (authored by Officer L. Bergstrom) states: "I [] recall that during contact with the Hispanic female at the arrest scene, [Garcia] was very eager to talk with me and made a few spontaneous statements while I performed a standing search on [Garcia]. [Garcia] kept trying to advise me, in essence, that [Garcia] 'was just driving,' and 'wasn't the one who did anything,' and 'was willing to speak with the officers about what [Spillman] had done ([Garcia] nodded back to my patrol vehicle where Spillman was seated in custody).' "

On August 14, 2024, the trial court held an evidentiary hearing on Garcia's petition. The court confirmed that in deciding Garcia's petition it would review the trial testimony of the 23 identified witnesses. The parties agreed that the court could consider Dr. Minagawa's report in lieu of his live testimony. The prosecutor, however, declined to stipulate to admission of Garcia's postcrime statements (as described in the two police reports). In response to the prosecutor's refusal to stipulate to Garcia's statements, defense counsel called Garcia as a witness "on the very sole issue of [Garcia's] statement to the officer immediately exiting the vehicle and nothing beyond the scope of that."

        a. Garcia's Hearing Testimony

Garcia testified (via video conference) that before the incident on May 21, he was at Antonio's apartment, and they smoked some marijuana. The shooting, however, occurred "[a]lmost two" hours later. By that time, Garcia was not feeling the effects of the marijuana. Antonio and Spillman were drinking alcohol and were too intoxicated to drive. When the police stopped the truck and took Garcia into custody, Garcia made a statement to the officer.[7]

Garcia testified further that Spillman (who was seated between Garcia and Antonio in the truck) did not have a gun in his hand as Garcia drove up next to the victim's car. Garcia did not know that Spillman had a gun in the truck and did not see Spillman take the gun out. Garcia also had "no idea" when Spillman pulled the gun out, " 'cause [Spillman] climbed over [Garcia] and placed his arm over behind [Garcia's] head, and [Garcia] heard the

---

[7] The trial court sustained the prosecutor's hearsay objection to admission of Garcia's postarrest statements. Defense counsel responded, "So at this point then, . . . I have to make my next plan . . . to handle the matter." Counsel then continued his direct examination of Garcia.

popping sound, and that's when [Garcia] knew there was a gun out." As Spillman climbed over Garcia, Spillman "was reaching out, out of the window, but his whole body was on [Garcia] []. [Spillman's] knee bumped the steering wheel. He pushed [Garcia] forward towards the steering wheel, [] and [Spillman] did what he did and then he moved back."

Garcia testified that he "thought" Spillman was "just yelling out the window, flipping the [victim] off trying to imitate [*sic*] him or scare him." Defense counsel asked, "so when [Spillman] was on top of you, did you hear something?" Garcia responded, "No, 'cause the radio -- we had the radio on loud." "[A]fter Spillman had got back in the middle and sat back in the middle, Antonio told [Garcia] to look back because, [] the [victim]'s window was shattered. So at that point, [Garcia] knew that [Spillman] shot out the window." Spillman handed the gun to Antonio, who put it in the glove compartment.

Garcia denied knowing that Spillman was going to shoot out of the window of the truck and was surprised that Spillman pulled the gun out and shot it. Garcia testified that Spillman did not say he was going to shoot or tell Garcia to pull alongside Soto's car so that Spillman could shoot at it.

After the shooting, Spillman told Garcia to "keep going, to keep driving." Out of fear of Spillman, Garcia did not pull over. Spillman was "yelling" and "punching Antonio." When Antonio told Spillman "to calm down because [Spillman] was acting irrational . . . [Spillman] turned around and told Antonio to shut the fuck up and hit [Antonio]." Spillman had behaved similarly throughout that day, both "before and after" the shooting.

Immediately after the police stopped the trio, Spillman told Garcia and Antonio not to say anything. Spillman also grabbed the gun and put it underneath the seat.

8

On cross-examination, Garcia testified that he and Spillman were "annoyed" but "not really" bothered by Soto's driving, and Spillman said " 'that motherfucker was gonna cause a crash.' " Garcia did not understand why Soto "was going in and out" of traffic and varying his speed. Garcia first noticed Soto's Honda in front of the trio on the freeway (and Spillman uttered his statement) about "20 minutes prior to the incident." Garcia drove the truck past the Honda—trying to get away from it—twice before the shooting.

Garcia testified that he and Soto started "driving back and forth." Garcia explained, "When I got on the freeway and I [saw] the Honda driving erratically, I was trying to pass it up to get away from that -- the way it was driving and go on with my business. And then it just became a cat-and-mouse type of thing. When I would pass it up, he would come up and then pass me again, and it was vice versa until the incident happened." Garcia admitted that the cat-and-mouse game "[i]rritated" him, and Spillman was becoming angry. It "made no sense to [Garcia] to pull over and just get out of the highway." Garcia did not think the cat-and-mouse driving was dangerous because he "wasn't driving in a way to harm anybody else." Garcia disagreed with Spillman's statement that the Honda was going to cause a crash.

Garcia explained that he did not see Spillman pull out the gun because Garcia was concentrating on driving. Garcia also explained that he did not hear the gun being fired repeatedly, because the trio "had the music on loud." When asked by the prosecutor if the gun had to have been fired near Garcia's head, Garcia answered, "Um, not really." Garcia explained, "Well, the way [Spillman] climbed over me and the way the truck is, the window is pretty

9

wide and his arm was touching the frame of the window, and I have the seat pulled all the way up 'cause I'm short."[8]

When Garcia learned that the shooting had occurred, he became upset and asked Spillman " 'What the fuck did you do?' "[9]

Garcia admitted that after the shooting, he "flip[ped] off" another driver because Garcia "didn't know how to act." Garcia added, "It was just too much. And with the car honking at me and, you know, it just added more to what I was already feeling." Garcia denied that flipping the other person off "was an act of anger." Rather, Garcia "was trying to communicate that . . . [he] had more stuff going on [that was] more serious than whatever [the other person] was honking at [Garcia] for."

    b. Dr. Minagawa's Report

In his report, Dr. Minagawa opined that "Garcia suffers from a primary diagnosis of [] other specified trauma- and stressor-related disorder (complex trauma), based on his history of exposures to traumas, abuse and neglect throughout his child and adolescent years, and his reactions to those experiences." "The multiple traumas experienced by Mr. Garcia had a profound effect on him in terms of attachment (his inability to relate to his mother and father, becoming involved in toxic relationships), biology (interfering with normal brain development), affect regulation (being unable to control his feelings of anger, sadness and anxiety), behavioral control

---

[8] On redirect examination, Garcia added that Spillman "was basically on his knees" behind Garcia and Spillman's arm completely stuck out the window. Garcia's head was down "by the dash."

[9] On redirect examination, Garcia said he was concerned, fearful, and anxious after realizing Spillman had shot at the Honda, but Garcia thought Spillman did so to "scare" the driver. Garcia added, "it was just too much. I suffer from PTSD. And just going through that, it took me back to my days of trauma, abuse. So I felt all the emotions I felt when I would be abused."

(getting into fights in prison), and cognition (difficulties in executive functioning, and problems with planning and anticipation)."

Dr. Minagawa further diagnosed Garcia "with a major depressive disorder, by history, as noted in [Garcia's] prison mental health records," cannabis and opioid use disorders (in remission), child physical abuse, child psychological abuse, child sexual abuse, and child neglect. Dr. Minagawa additionally opined that Garcia did not "present as a risk for violence either in the near term or future," "has participated in several programming opportunities to improve himself," "has gained insight into his internal emotional states, and has been able to abstain from drugs while exploring the root causes of his addictions."

### c. 2004 Trial Witness Testimony

The trial testimony reviewed by the trial court in deciding Garcia's petition demonstrated the following:

Antonio testified that he was Garcia's friend and on the day of the shooting, Antonio was 18 years old. Garcia had introduced Antonio to Spillman, but Antonio had not known Spillman for long.

While Antonio and Garcia were outside Antonio's apartment building on May 21, Spillman arrived in his GMC Sierra pickup truck. Spillman drove the trio in the truck to a drugstore where Antonio made a purchase. From there, Spillman continued driving until Garcia "wanted to take the wheel because [Garcia] wasn't drinking or nothing. And Spillman was all drunk." Spillman had been drinking Bud Light, and Antonio drank one 24-ounce can of beer as well. Spillman additionally "was acting dumb" and "[s]ocked" Antonio on his cheek but "not that hard."

Garcia drove the truck on Highway 101 as Spillman sat in the middle and Antonio sat in the passenger's seat. The trio noticed a gray Honda slow

down in front of them.  According to Antonio, Spillman "was just like all mad."  Spillman "[g]ot his gun out" from the glove compartment.  Garcia tried to pass the Honda, but "that car moved [into] the same lane when [Garcia] switched lanes.  So that's when [Spillman] started getting mad."  Garcia did not ever "have a chance to pass [the Honda] because there w[ere] more cars coming.  Because [] [Garcia] went back to the left lane, and that's when there was a lot of traffic."  According to Antonio, the driver of the Honda was driving as if he was "playing trick games with" the trio.  Spillman told Garcia "[j]ust to pass the [Honda]."  Garcia tried to do so.

Antonio testified that once Spillman took the gun out, Spillman was "[t]rying to shoot at that dude" in the Honda.  Spillman did this by "[p]ushing [Garcia] to the front [toward the steering wheel].  That's when we started swerving."  Spillman said something "like, 'let me see,' like 'move,' like telling [Garcia] like 'move a little.'  Like in a nice way, like 'move, please.' "  Spillman pointed the gun "towards the air, like he was shooting towards the air.  [Antonio] couldn't see that much."  Spillman's arm was "[b]ehind" Garcia and out the driver's window.

Antonio heard the gunshots.  He thought Spillman "was shooting up in the air, just trying to scare" the Honda's driver.  Antonio looked back and saw the Honda drive into an intersection.  Antonio told Garcia to look back and when Garcia did, Antonio and Garcia "were just all quiet."  Antonio thought the Honda's driver had been shot or killed.  Garcia continued driving.

Antonio testified that he did not know if during the incident Spillman had told Garcia to "get next to" the Honda.  In addition, Antonio testified he did not remember if Garcia got next to the Honda before the shooting or in which lanes the trio's truck and the Honda were traveling at the time of the

shooting.  Antonio also did not remember if Garcia had touched the gun on the day of the shooting.

Later, when the police stopped the trio, Spillman "said, 'Don't say nothing.' "  In addition, Spillman put the gun under the seat.

On cross-examination, Antonio testified that as Garcia drove away from the shooting scene, another driver shook his finger and pointed at the trio.  Antonio did not remember what Garcia did in response to the other driver's action.  As for Antonio himself, he testified that he did "[n]othing" and then added, "I think I flipped him off.  I don't know.  I don't remember."

Francis J. testified that he was driving his Plymouth Grand Voyager in the fast lane on Highway 101 when he saw behind him (in his rearview mirror) a pickup truck "almost pushing" a gray Honda.  There was a "big semi truck" to Francis's right. As soon as Francis passed the semi truck, the Honda passed Francis on the right, and the pickup did as well.  Although there was quite a bit of traffic, it appeared to Francis that "the pickup wanted to get up to [the Honda] or trying to like cat and mouse, trying to catch [the Honda]."

The Honda moved back into the fast lane.  The pickup eventually got behind the Honda again, then "got back into the slow lane trying to get beside it."  The Honda started slowing down and moving to the left into a turn lane, and the "pickup slowly c[a]me over to it," moving to the fast lane.  "[T]he pickup didn't zoom by.  It just kind of slowed down and went up next to [the Honda] as they were slowing down."  When asked if it looked like the pickup was trying to get beside the Honda, Francis answered, "Well, yeah.  Or get ahead of them or something.  I mean it was kind of a back-and-forth type thing.  You know, I mean it happened so quick, I mean the whole incident,

. . . it just looked like they were trying to catch up to him or motion to him or whatever. I don't know."

Francis testified that while the pickup was in front of his Voyager in the fast lane and the Honda was to the left (in a turn lane), Francis saw the gun come out. The pickup was "almost right next to the Honda." The hand and gun extended about six inches out of the pickup's driver's side window for maybe "seven, ten seconds." To Francis, the hand and arm looked "Caucasian." Francis heard and saw three shots. The pickup was within "probably 3 to 4 feet" of the Honda and "coming up right next to it." Francis told investigators that he saw the shooter's "arm go behind the driver's head" at the time of the shooting.

The Honda continued for a short distance and stopped. According to Francis, the pickup was "trying to get away. I mean, it was obvious that they were speeding away." The pickup weaved in and out of traffic.

Shirley testified that she was in the front seat passenger of the Voyager when her husband Francis pointed out the Honda and the pickup truck. She looked in the mirror and "saw the truck was right up on" the Honda. The truck was "flashing their lights." The truck was right behind the Honda, so close that it "could have hit them if it got any closer."

According to Shirley, the Honda continued driving in the fast lane until it was right behind the Voyager and then the Honda "just kind of zoomed around [the Voyager] and got into the fast lane again." The truck followed. It was "obvious" to Shirley that the truck was "chasing" the Honda. The Honda merged into a turnout lane and the truck concurrently merged into the fast lane; "they got beside the Honda." "[T]he gun c[a]m[e] out as they were merging over." "[A]s soon as the gun finished firing, the truck just zoomed away. And then it was trying to go around traffic."

14

Brent W. testified that he was driving his pickup truck north on Highway 101 when, in his rearview mirror, he saw "three cars going faster than everyone else." Brent moved over to the slow lane to let them pass. The first car (a silver Honda) remained in the fast lane after passing Brent. "The third car, being the pickup truck, passed [Brent] and then moved into . . . the slow lane, and matched speed with the first car. Paralleled." To do this, the truck "accelerated" and "then it slowed down." The truck "matched the speed of the Honda" for between 20 and 30 seconds at a speed of approximately 50 miles per hour.

From about 30 feet away, Brent saw that "a person stuck his arm out of the driver's window in the pickup truck and pointed a gun at [the Honda] in the opposite lane." The gun was "a silver- or chrome- plated semi-automatic pistol." Brent testified that the arm was out the window for a "little less than the amount of time that the truck was matching speeds with the victim's car." The arm had blonde hair on it and appeared to be that of a very large Caucasian man.[10] Additionally, "the arm was sticking out of the window full length and holding the gun as if you're going to shoot it." The truck "wasn't weaving at all." Brent heard a single shot, and glass sprayed onto his truck.[11] The Honda slowed down, pulled toward the center median, and stopped.

After the shooting, the truck "was fleeing. It was trying to get . . . away from anybody that might have seen it. It was weaving in and out of traffic." Shortly before the truck exited the freeway, Brent "was struggling to keep up with it, weaving in and out of traffic [him]self. And it may have got up to 70

---

[10] The trial testimony indicated that Spillman is Caucasian and blond.
[11] A California Department of Justice (DOJ) senior criminalist testified that "[a]ll pistols will be extremely loud" when fired.

or 75 miles an hour." Brent followed the truck when it exited the freeway and eventually saw that the police had stopped the truck.

Jason T., an off-duty police officer who was driving on Highway 101, testified that he noticed the truck about one mile north of White Road (the location where police found Soto's Honda). The truck was being driven recklessly and dangerously by Garcia. Garcia was tailgating other vehicles in the fast lane, apparently to get them to move over. At one point, the truck began to exit the freeway and then veered back as if to reenter the roadway. Jason took Garcia's action as a "confrontation." Jason honked at the truck. Garcia turned toward Jason and "flipped [him] off." Garcia then "laughed" and "turn[ed] towards the passengers," appearing to have a discussion with them. Garcia later "flipped [Jason] off again" as the truck exited the freeway.

Police responded to the location of the shooting on Highway 101 in Salinas and found Soto deceased inside his Honda.[12] An officer observed glass on the front passenger-side floorboard, a shattered (but still intact) rear passenger-side window that had a bullet hole in its bottom portion, and a bullet hole in the top of the front passenger-side door frame. Police found three expended cartridge casings along the roadway. They found a bullet in the interior portion of the Honda's rear driver's side door and a bullet in the front passenger door. According to a forensic evidence technician and a DOJ senior criminalist, the trio's truck was likely moving past the Honda (from its back to its front) as the shots were fired.

Police stopped the trio on a road off Highway 101, approximately eight to 10 miles north of where Soto's Honda stopped. Garcia was driving the

---

[12] A pathologist testified that Soto died from a single gunshot wound. The bullet entered below Soto's right shoulder, traveled through his chest on downward trajectory, and lodged in his left chest wall.

16

truck; Spillman was the middle passenger; and Antonio was the right-side passenger. The truck had a split bench seat (i.e., the driver's seat could be adjusted separately from the rest of the bench). A photograph depicted the driver's seat "more forward than the passenger seat next to it."

Police found a loaded 9mm semiautomatic pistol in a holster underneath the driver's seat of the truck. Police also found two magazines (loaded with 9mm ammunition) in a pocket in the truck's driver's door panel.

Tests for gunshot residue found none on Spillman or Antonio but some on Garcia's left palm, the tops and palms of Soto's hands, and the passenger side of the pickup truck.

### d. Parties' Arguments

After the hearing on August 14, 2024, the parties filed closing briefs addressing the evidence.

The district attorney contended Garcia's "story that he never saw the gun or heard the gunshots going off next to his head is patently absurd." The district attorney further asserted that Garcia's "claim to be a victim of Spillman and acting out of fear is belied by his reaction to the off-duty police officer following his vehicle. The act of 'flipping off' the witness shows that [Garcia] was an angry violent active participant in a road rage murder. He clearly caused this murder to occur by lining up the vehicles to allow Spillman to shoot. His desire to have the victim shot is evident. He got his wish."

Garcia raised multiple arguments to demonstrate that "the prosecution presented insufficient evidence beyond a reasonable doubt that [] Garcia committed second degree murder under current law, whether by a direct perpetrator theory or on a direct aiding and abetting theory and whether with express and/or implied malice aforethought."

17

e. Trial Court's Ruling

At a hearing held on November 15, 2024, the trial court denied Garcia's petition. The court found that Garcia directly aided and abetted the homicide with an intent to kill.

The trial court explained: "The [c]ourt obviously knows [Garcia] was not the actual killer. However, the [c]ourt finds beyond a reasonable doubt that [Garcia] directly aided and abetted the homicide with malice aforethought, with the same malice aforethought as the actual killer. [¶] I will find that based on the testimony, as well as the review of all the evidence that was submitted, that [Garcia] did act with the intent to kill. He was a major participant. [¶] Some of the factors the [c]ourt has to take into consideration are whether [Garcia] was in a position to facilitate or prevent the event. He clearly not only facilitated it, he put that vehicle in the position where Mr. Spillman could shoot and kill the victim. [¶] The [c]ourt looks at the role [Garcia] played in the event. He was the driver. The [c]ourt looks at the behavior before and after the shooting, any knowledge of a weapon, and the duration of the driving."

The trial court described Antonio's trial testimony regarding Garcia's and Spillman's actions inside the truck before the shooting. The court also described the testimony of eyewitnesses Francis, Shirley, and Brent about the movements of the truck before, during, and after the shooting, as well as Garcia's conduct in flipping off Jason.

Regarding Garcia's evidentiary hearing testimony, the trial court noted that Garcia initially testified that he "heard popping sounds" when Spillman's hand was behind Garcia's head but later said that "he didn't hear the gun being fired because music was playing and it was loud." The court did not find Garcia's testimony credible, explaining: "There were numerous

18

inconsistencies in [Garcia's] testimony at the hearing compared to the testimony by the independent witnesses at the time of the jury trial. There's no way that [Garcia] could not see a gun in a truck with one bed seat. Obviously, the gun was in the cab, the hand with the gun was outside for a period of seconds, and it is not credible [Garcia] didn't hear the shots from a gun that would have been less than 12 inches from his head."

B. *Appellate Events*

In February 2025, Garcia's appointed appellate counsel filed a *Delgadillo* brief. This court informed Garcia of his right to submit a supplemental brief.

On April 25, 2025, Garcia filed a "request for substitute/replacement counsel on appeal" (capitalization omitted) (hereafter request for appointment of substitute appellate counsel). In that request, Garcia asserts his appeal includes an arguably meritorious issue of insufficient evidence to support the trial court's denial of his petition. Garcia also asserts that he needs appellate counsel to file a companion habeas corpus petition due to defense counsel's ineffective assistance for (1) failing to adequately prepare Garcia for his evidentiary hearing testimony and (2) advising Garcia to make a false inculpatory admission about having flipped off another driver who happened to be an off-duty police officer.

This court deferred consideration of Garcia's request for appointment of substitute appellate counsel pending consideration of Garcia's appeal.

In October 2025, Garcia filed a supplemental brief on the merits of his appeal. Garcia contends there is insufficient evidence supporting a conviction for murder based on either express or implied malice. Garcia further asks this court to instruct appellate counsel to evaluate the need for a companion habeas corpus petition in this matter based on the appellate record and

19

extra-record information supporting an IAC claim for failing to properly prepare Garcia to testify at the evidentiary hearing.

## II. DISCUSSION

Where, as here, appellate counsel finds no arguable issues in an appeal from the denial of a section 1172.6 petition, we are not required to conduct an independent review of the record. (See *Delgadillo*, *supra*, 14 Cal.5th at pp. 224–231.) We give the defendant the opportunity to file his or her own supplemental brief, and we then evaluate any specific arguments raised. (*Id.* at pp. 231–232.) Accordingly, we address the issues Garcia has asserted in his supplemental briefing.

A. *Sufficiency of the Evidence*

Garcia contends: "Contrary to the trial court's conjecture, there was no evidence that [Garcia] intentionally positioned the truck next to the Honda so that Spillman could shoot a gun or knew that Spillman had an intent to shoot a gun. There was no evidence that [Garcia] knew Spillman had a gun at the time he reached behind [Garcia] to shoot the gun. There was no evidence that [Garcia] saw a gun until after the shooting was completed. There was no evidence that Spillman signaled his intention to [Garcia], made an announcement of intent, or asked anyone to facilitate his plan or sought their acquiescence thereto. There is no evidence [Garcia] had awareness or knowledge of Spillman's intentions at all until after the fact of the shooting."

1. Legal Principles

a. Section 1172.6

At a section 1172.6 evidentiary hearing to determine a petitioner's entitlement to relief, " 'the burden of proof shall be on the prosecution to prove, beyond a reasonable doubt, that the petitioner is guilty of murder'

20

under state law as amended by [Senate Bill 1437]." (*People v. Emanuel* (2025) 17 Cal.5th 867, 880 (*Emanuel*), quoting § 1172.6, subd. (d)(3).)

b. Aiding and Abetting Murder

Section 188 (as amended by Senate Bill 1437) provides in relevant part: "(a) For purposes of [s]ection 187, malice may be express or implied. [¶] (1) Malice is express when there is manifested a deliberate intention to unlawfully take away the life of a fellow creature. [¶] (2) Malice is implied when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart. [¶] (3) Except as stated in subdivision (e) of [s]ection 189 [governing felony murder], in order to be convicted of murder, a principal in a crime shall act with malice aforethought. Malice shall not be imputed to a person based solely on his or her participation in a crime." (See also *Curiel*, *supra*, 15 Cal.5th at pp. 448–449 [explaining Senate Bill 1437's changes to murder law].)

"Senate Bill 1437 does not eliminate direct aiding and abetting liability for murder because a direct aider and abettor to murder must possess malice aforethought." (*People v. Gentile* (2020) 10 Cal.5th 830, 848, superseded by statute on another ground as stated in *Wilson*, *supra*, 14 Cal.5th at p. 869; see *Curiel*, *supra*, 15 Cal.5th at pp. 462–463; see also *People v. Reyes* (2023) 14 Cal.5th 981, 990–991 (*Reyes*) [explaining direct aiding and abetting of implied malice murder]; CALCRIM No. 526.)

"A direct aider and abettor's 'guilt is based on a combination of the direct perpetrator's acts and the aider and abettor's *own* acts and *own* mental state.'" (*People v. Pacheco* (2022) 76 Cal.App.5th 118, 124, quoting *People v. McCoy* (2001) 25 Cal.4th 1111, 1116–1117.) " '[U]nder direct aiding and abetting principles, an accomplice is guilty of an offense perpetrated by

another [e.g., murder] if the accomplice aids the commission of that offense with "knowledge of the direct perpetrator's unlawful intent and [with] an intent to assist in achieving those unlawful ends." ' " (*Curiel, supra,* 15 Cal.5th at p. 463; see also *People v. Perez* (2005) 35 Cal.4th 1219, 1225; CALCRIM No. 401.)

"A person is 'concerned' [in the commission of the crime under section 31] and hence guilty as an aider and abettor if, with the requisite state of mind, that person in any way, directly or indirectly, aided the actual perpetrator by acts or encouraged the perpetrator by words or gestures." (*People v. Nguyen* (1993) 21 Cal.App.4th 518, 529.) "[I]n general neither presence at the scene of a crime nor knowledge of, but failure to prevent it, is sufficient to establish aiding and abetting its commission. [Citations.] However, '[a]mong the factors which may be considered in making the determination of aiding and abetting are: presence at the scene of the crime, companionship, and conduct before and after the offense.' " (*People v. Campbell* (1994) 25 Cal.App.4th 402, 409.)

"Because direct evidence of a defendant's intent rarely exists, intent may be inferred from the circumstances of the crime and the defendant's acts." (*People v. Sanchez* (2016) 63 Cal.4th 411, 457; see also *People v. Medina* (2019) 33 Cal.App.5th 146, 153 ["[f]iring a gun at [the victims] from . . . close range was substantial evidence from which the jury could find a specific intent to kill"].)

   c. Standard of Review

We generally review the denial of a section 1172.6 petition following an evidentiary hearing for substantial evidence. (*Emanuel, supra,* 17 Cal.5th at p. 885.) "Under this standard, 'we review the record " ' "in the light most favorable to the judgment below to determine whether it discloses substantial

22

evidence — that is, evidence which is reasonable, credible, and of solid value — such that a reasonable trier of fact" ' " ' could find beyond a reasonable doubt that" Garcia directly aided and abetted murder. (*Ibid.*; cf. *College Hospital Inc. v. Superior Court* (1994) 8 Cal.4th 704, 715 [describing the *Watson* harmless error standard and the substantial evidence standard].)

"In applying this test, we . . . presume in support of the judgment the existence of every fact the [trier of fact] could reasonably have deduced from the evidence." (*People v. Zamudio* (2008) 43 Cal.4th 327, 357 (*Zamudio*).) "We 'must accept logical inferences that the [trier of fact] might have drawn from the circumstantial evidence.' " (*Ibid.*) " 'We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence. [Citation.]' [Citation.] A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support" ' the [trier of fact]'s verdict." (*Ibid.*) "However, '[a] reasonable inference . . . "may not be based on suspicion alone, or on imagination, speculation, supposition, surmise, conjecture, or guess work. [¶] . . . A finding of fact must be an inference drawn from evidence rather than . . . a mere speculation as to probabilities without evidence." ' " (*People v. Davis* (2013) 57 Cal.4th 353, 360.)

    2. <u>Analysis</u>

Reviewing the evidence in the light most favorable to the trial court's order, we decide the record includes substantial evidence to find, beyond a reasonable doubt, that Garcia directly aided and abetted the murder of Soto with an intent to kill.

The evidence shows that after Soto's Honda slowed down and moved in front of the trio's truck (as if Soto were "playing trick games with" the trio), Spillman got angry and pulled his gun out of the glove compartment.

23

According to Antonio, once Spillman took the gun out, Spillman was "[t]rying to shoot at" Soto. To accomplish that goal, Spillman pushed Garcia forward, asked Garcia to " 'move' " out of the way while extending his (Spillman's) arm behind Garcia, and fired the gun. Garcia did not attempt to disengage from the "cat-and-mouse" interaction with Soto or to resist Spillman's effort at thrusting his arm out the driver's window toward Soto. This evidence supports a reasonable inference that Garcia knew of Spillman's intent to kill Soto.

Eyewitness testimony further substantiates that Garcia intended to and, in fact, did aid and abet Spillman in killing Soto. Francis saw Garcia "trying to get [the truck] beside" the Honda and "coming up right next to it" as Spillman fired the gun three times. Shirley similarly testified that the truck was "chasing" the Honda, moved toward it, and got beside it as the gun came out the driver's window. Further, according to Brent, Garcia maneuvered the truck to match the speed of the Honda and drive alongside it.

After the shooting, Garcia did not stop the truck. Rather, Garcia sped away, weaving in and out of traffic. In addition, when Jason (the off-duty police officer) honked at Garcia for driving recklessly, Garcia flipped Jason off and laughed.

The trial court found not credible Garcia's testimony about not seeing the gun or hearing the shots. When reviewing a record for substantial evidence, we defer to the trial court's credibility findings. (See *Zamudio*, *supra*, 43 Cal.4th at p. 357.)

In short, we disagree with Garcia's contention that the trial court's denial of his petition was based on conjecture. We decide that the totality of the evidence—including Garcia's actions before and after the shooting and

24

reasonable inferences therefrom about his mental state—sufficiently establishes Garcia's guilt, beyond a reasonable doubt, of directly aiding and abetting Soto's murder with express malice. In other words, substantial evidence supports that Garcia knew and shared Spillman's intent to kill at the time Garcia intentionally aided and abetted Spillman in committing the murder by driving the truck alongside Soto's Honda.[13]

B. *Alleged IAC and Request for Assistance with Habeas Corpus Petition*

In his supplemental brief, Garcia asks this court to "instruct [appointed appellate] counsel to evaluate the need for a companion habeas corpus petition to the appeal based on ineffective assistance of counsel with regard to [] counsel's failure to prepare Garcia to testi[fy] at the evidentiary hearing, . . . given th[e] information relevant to this issue is outside the record on appeal." Garcia claims that his defense counsel "was prejudicially ineffective by advising [Garcia] to falsely 'admit' to [] having 'flipped off' an off-duty police officer after the shooting to avoid looking like a 'goody two-shoes' if called to testify at the evidentiary hearing." (Boldface omitted.) Garcia also claims that "[c]ounsel was prejudicially ineffective by misleading [Garcia] to believe that he would not be called to testify at the evidentiary hearing unless the prosecutor introduced 'new evidence' and by failing to prepare [Garcia] adequately to testify for the hearing." (Boldface omitted.)

"Appointed counsel in noncapital appeals do not have an obligation to investigate possible bases for collateral attack on the judgment, and retained counsel must do so only if the client retains them for that purpose." (*In re*

---

[13] Because we conclude the evidence sufficiently supports a denial of Garcia's petition based on express malice, we do not consider whether there also is substantial evidence to support a denial based on direct aiding and abetting of implied malice murder. (See *Reyes*, *supra*, 14 Cal.5th at pp. 990–991.)

*Clark* (1993) 5 Cal.4th 750, 783, fn. 20, superseded by statute on other grounds as stated in *Briggs v. Brown* (2017) 3 Cal.5th 808, 842.) "While [such appointed appellate counsel] have no obligation to conduct an investigation to discover if facts outside the record on appeal would support a petition for habeas corpus or other challenge to the judgment, if they learn of such facts in the course of their representation they have an ethical obligation to advise their client of the course to follow to obtain relief, or to take other appropriate action." (*Id*. at p. 784, fn. 20; see also *Redante v. Yockelson* (2003) 112 Cal.App.4th 1351, 1356 ["in noncapital appeals, appointed counsel has no obligation to investigate possible bases for collateral attack on a judgment" and "is not responsible for filing an actual frivolous appeal, nor is [counsel] required to contrive arguable issues"].)

Based on *Clark*, we reject Garcia's request to instruct appellate counsel to "evaluate, prepare and file a habeas corpus petition companion to the appeal." We express no opinion on the propriety or merits of any IAC claim regarding the section 1172.6 proceedings that Garcia might raise later in a petition for writ of habeas corpus.

C. *Request for Substitute Appointed Counsel*

As noted *ante* (see pt. I.B.), this court deferred consideration of Garcia's request for appointment of substitute appellate counsel pending consideration of Garcia's appeal. Because the grounds stated in that request are essentially identical to those that Garcia raises in his supplemental brief, which we have rejected as lacking merit, we deny Garcia's request for appointment of substitute appellate counsel.

### III. DISPOSITION

The trial court's November 15, 2024 order denying Garcia's Penal Code section 1172.6 petition is affirmed.  Garcia's April 25, 2025 request for substitute/replacement counsel on appeal is denied.

_____
Danner, J.

WE CONCUR:

_____
Greenwood, P. J.

_____
Bromberg, J.

**H052749**
*People v. Garcia*